In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2150

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*v.*

RAYMOND J. MCNAMEE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 4259—**Milton I. Shadur**, *Judge.*

ARGUED NOVEMBER 27, 2006—DECIDED MARCH 8, 2007

Before EASTERBROOK, *Chief Judge*, and ROVNER and
SYKES, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Raymond McNamee took
part in a scheme to distribute shares of U.S. Wind Farm-
ing, Inc., to the public without registration under the
Securities Act of 1933. William L. Telander, who con-
trolled U.S. Wind Farming, caused it to transfer shares to
McNamee and other persons by sales that purportedly
were exempt from registration under §4(2) of the 1933
Act, 15 U.S.C. §77d(2), because they were not part of
a public distribution. See also Regulation D, 17 C.F.R.
§230.504. The recipients promptly resold these shares to

the market and gave Telander a portion of the proceeds, demonstrating that the "non-public sale" designation was a sham. In this transaction, McNamee and the other intermediaries were underwriters, a term that "means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking" (§2(a)(11), 15 U.S.C. §77b(a)(11)). The registration requirement of §5, 15 U.S.C. §77e, therefore applied to all sales until the shares came to rest in the hands of *bona fide* investors and for some time thereafter, since the stock was unseasoned. See Rule 174, 17 C.F.R. §230.174.

The Securities and Exchange Commission sought equitable relief, and on July 25, 2005, the district court issued a temporary restraining order directing McNamee and all other participants to comply with the registration requirement. Both the TRO and the preliminary injunction that replaced it barred the defendants "from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under [the Securities Exchange Act of 1934, 17 C.F.R. §240.3a51-1]." (This language comes from the preliminary injunction; the TRO was functionally identical.) Thus the district court barred Telander and associates from (a) distributing unregistered stock, if securities law calls for registration; and (b) participating in any offering of penny stock, registered or not.

McNamee promptly repeated the proscribed conduct, this time with one of his own corporations. A month before the TRO issued, McNamee had caused Energy Finders, Inc., a firm he controlled, to transfer more than 2.4 million

shares to Primordial Group, LLC, another firm he controlled. The day after the district judge entered the TRO, McNamee caused Primordial Group to start selling these shares to the public. Primordial Group sold some 78,000 shares on July 26 and continued selling through August 26. In all, Primordial Group sold 403,827 shares for $564,738.34. The Energy Finders shares were "penny stock" and not registered under §5.

The district court held McNamee in contempt. As a sanction it directed him to disgorge the proceeds. The fund will be tapped to repay investors who purchased the stock from Primordial Group. If these investors or their transferees cannot be located, or do not elect to surrender their shares in exchange for the original purchase price, then any remaining funds will be transferred to the Treasury; McNamee cannot receive anything back. The order added that, if McNamee did not pay within ten days, the amount he owes would rise $1,000 per day until full payment had been made. This portion of the order was stayed, however, before it took effect, so only the obligation to pay the $565,000 is at issue.

An order holding a litigant in contempt of court is not appealable while the litigation continues. See, e.g., *Fox v. Capital Co.*, 299 U.S. 105 (1936); *Doyle v. London Guarantee & Accident Co.*, 204 U.S. 599 (1907); *Hayes v. Fischer*, 102 U.S. 121 (1880); *Powers v. Chicago Transit Authority*, 846 F.2d 1139 (7th Cir. 1988). Resolution must await the final decision in the litigation. When the disobeyed order would be independently appealable under an exception to the final-decision rule, then the contempt citation also may be appealable. See *Central States Pension Fund v. Wintz Properties, Inc.*, 155 F.3d 868, 872-74 (7th Cir. 1998); *Rimsat, Ltd. v. Hilliard*, 98 F.3d 956, 963-64 (7th Cir. 1996). We say "may be" rather than "is" because this is an example of pendent appellate jurisdiction, and, as

*Rimsat* recognized, that doctrine is shaky after *Swint v. Chambers County Commission*, 514 U.S. 35, 50-51 (1995). Whatever scope this doctrine retains does not assist McNamee, because he not only consented to the terms of the preliminary injunction but also expressly waived his right to appeal from its entry. He cannot use his own defiance to obtain appellate review of the injunction in the teeth of that waiver.

As it happens, however, the dispute is no longer interlocutory. While this appeal was pending, the district court entered a permanent injunction. Once a final decision takes effect, premature notices of appeal spring into force under Fed. R. App. 4(a)(2). McNamee has filed a further appeal (No. 07-1351) from the permanent injunction; we will deal with that appeal separately, as the issues have little overlap with those that bear on the contempt adjudication. McNamee tries to contest the preliminary injunction, using arguments that might also be deployed against the permanent injunction, but his waiver (which he did not repeat at the permanent-injunction stage) forecloses for the time being all arguments bearing on the propriety of equitable relief. Moreover, the rule that even invalid injunctions must be obeyed until stayed or reversed, see *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 439 (1976); *United States v. Mine Workers*, 330 U.S. 258, 293-94 (1947); *Howat v. Kansas*, 258 U.S. 181, 189-90 (1922), prevents McNamee from using any supposed defects in the injunction as defenses to his adjudication in contempt.

Although the district judge relied on McNamee's violation of the penny-stock clause, a violation of the injunction's main requirement—that all defendants refrain from selling unregistered stock when §5 requires registration—is easy to see. Primordial Group distributed Energy Finders' stock to the public as an underwriter. McNamee was himself an "issuer" for the purpose of identifying an

underwriter, given the clause of §2(a)(11) defining as an "issuer" anyone who controls the securities' issuer. McNamee does not even attempt to argue that §4(2), which allows non-public sales without registration, applies to these events. The stock went from Energy Finders to the public via Primordial Group, at McNamee's direction. None of the buyers promised to refrain from swift public resale (a vital part of any legitimate non-public transaction).

What's more, because Primordial Group acted as underwriter, §4(2) could not apply even if the sales had been restricted to a handful of investors, for §4(2) covers only "transactions by an issuer". When an underwriter takes part, registration is mandatory for every "distribution" of securities—and McNamee no more argues against the "distribution" characterization than against the conclusion that the shares were distributed to "the public." Rule 144, 17 C.F.R. §230.144, provides a safe harbor for insiders such as McNamee who want to sell their own stock without registration; McNamee did not try to use Rule 144 and did not come close to meeting its requirements. (Nor is any other exemption, such as that for intra-state sales, arguably available.) What McNamee did bears a strong resemblance to the conduct that landed Louis Wolfson in prison almost 40 years ago for violating §5 and played an indirect role in costing Abe Fortas his seat on the Supreme Court. See *United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968). McNamee should not have needed an injunction to tell him that his scheme was unlawful.

The district court likely relied on the penny-stock portion of the injunction, rather than the registration portion, because the penny-stock provision is broader: McNamee is forbidden to offer penny stock to the public even if it is registered (or registration is unnecessary). McNamee surprisingly argues that the penny-stock provision is narrower and that he did not violate its restrictions. The

opening he sees is the reference in the penny-stock clause to "an offering" of securities. He may have *sold* Energy Finders stock to the public, McNamee allows, but he insists that he did not make "an offering." He interprets "offering" as an all-at-once transaction, as when an underwriter puts a large bloc of shares up for sale and does not deliver any until all buyers have placed their orders. By dribbling stock out to the market over a month, McNamee believes, he avoided making "an offering." Louis Wolfson advanced the same argument; it is no better now than it was then. (*Wolfson* also rejected McNamee's argument that selling through brokers relieves a control person of the need to register stock.) An "offering" may be spread over time. So the Supreme Court held in *SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953). McNamee formed a plan to move securities from the issuer to the public, where they would trade freely; that plan is a "view to a distribution" and the process as a whole an "offering" no matter how long it takes to accomplish.

According to McNamee, however, reliance on advice of counsel exculpates his conduct. The district judge rejected this defense, and sensibly so. First, advice of counsel may show that a person lacked a culpable intent and thus may defeat criminal liability, but *scienter* is not required in civil-contempt proceedings. See *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). Reliance on the advice of counsel accordingly is not a defense. See *In re Walters*, 868 F.2d 665, 668-69 (4th Cir. 1989). Second, McNamee offered nothing other than his say-so. He did not produce any letter from a securities lawyer giving advice that reflected knowledge of all material facts; he did not produce any opinion letter, period. Nor did McNamee offer the live testimony of any securities lawyer. It isn't possible to make out an advice-of-counsel defense without producing the actual advice from an actual

lawyer. See *Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994).

It is unsurprising that no lawyer could be found to stand behind the "advice" that McNamee claims to have received—that the injunction applies exclusively to future sales of U.S. Wind Farming's securities, leaving him free to do as he pleases with any other securities. The injunction grew out of securities-law violations committed in the distribution of U.S. Wind Farming's securities, but it is not so limited. Injunctions often are designed to fence in wrongdoers, and this injunction's terms are general. The penny-stock provision of the preliminary injunction reads in full (bracketed material in original; emphasis added):

> IT IS HEREBY FURTHER ORDERED that Defendants and their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and each of them, are preliminarily barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of *any* penny stock. A penny stock is *any* equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. 240.3a51-1].

One is inclined to ask what part of "any" McNamee doesn't understand. No lawyer—indeed, no literate person—could think this portion of the injunction limited to securities of which U.S. Wind Farming is the issuer. And, quite apart from the penny-stock portion of the injunction, no securities lawyer would have told McNamee that his conduct satisfied §5.

So far we have treated the adjudication, as the district court did, as one in civil contempt. McNamee contests this characterization. He contends that the remedy is criminal rather than civil—and, if so, further proceedings are required, for the contempt did not occur in the district judge's presence, and McNamee would be entitled to a trial at which his guilt must be established beyond a reasonable doubt. Summary judgment is not allowed in criminal proceedings.

McNamee calls the order to pay $565,000 punishment for disobedience; the SEC calls it compensatory. The difference is vital.

> A contempt fine . . . is considered civil and remedial if it either "coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." *United States* v. *Mine Workers,* 330 U.S. 258, 303-304 (1947). Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge. See *Penfield Co. of Cal.* v. *SEC,* 330 U.S. 585, 590 (1947). Thus, a "flat, unconditional fine" totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance. *Id.,* at 588.

*Mine Workers v. Bagwell*, 512 U.S. 821, 829 (1994) (bracketed material in original). The SEC's theory depends on the fact that purchasers can recover their outlays from the fund created by McNamee's payment. Rescission—the investor returns the security and receives the purchase price in return—is the ordinary civil remedy for the sale of unregistered stock. See sections 11(e) and 12(a) of the 1933 Act, 15 U.S.C. §§ 77k(e), 77*l*(a).

The district court's order differs from rescission in two ways. First, the investors do not return their stock to the

seller in exchange for a refund of the purchase price. Under the district court's order, the stock is to be cancelled rather than restored to McNamee or Primordial Group. If McNamee owned all of the firm's stock, then cancellation and return would amount to the same thing; to the extent outside investors own equity interests, however, cancellation dilutes McNamee's stake in favor of those investors who retain their shares.

Second, McNamee's obligation is unconditional. Instead of reversing the transaction for investors who want their money back, McNamee must hand over 100% of the proceeds. To the extent that investors spurn the opportunity for rescission—as they will if Energy Finders is trading for more than the purchase price, or they resold for more than that price at any intermediate point—McNamee's payment becomes a flat fine.[†] The investors keep the stock, while McNamee loses both the stock and the purchase price. If one third of the investors tender their stock for rescission, then McNamee has effectively been ordered to pay treble damages. If only 10% tender, then McNamee has been ordered to pay ten times the remedial amount, a sum that would be difficult to justify even if it were described as punitive damages. See *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 425 (2003) (double-digit multipliers are difficult to justify in civil litigation); cf. *Phillip Morris USA v. Williams*, No. 05-1256 (U.S. Feb. 20, 2007).

The district judge did not explain why the order provides that the purchasers' shares are cancelled rather than

---

[†] In late February 2007 Energy Finders, symbol EGYF on the Pink Sheets, was trading for 29¢ a share, while Primordial Group realized $1.39 per share in the public sale, so it would be worthwhile for the buyers and their transferees to accept the district court's offer—unless the buyers had sold for a higher price in the interim. But even if all buyers would find rescission worthwhile, the tracing problem is potentially serious.

returned to McNamee, or why McNamee must disgorge 100% of the proceeds even if not a single investor decides to return his stock in exchange for a refund of the purchase price. Nor does the SEC offer an explanation; it treats the remedy as unexceptionable because McNamee did not pay Energy Finders for the stock. Whether he gave value for the shares is disputed but irrelevant. The question is not Primordial Group's or McNamee's tax basis in the stock but its market value. If McNamee's grandmother had given him Blackacre, with a market value of $500,000, a federal agency could not confiscate the house and assert that McNamee hadn't lost anything, because he hadn't paid for the house to begin with. And if McNamee had violated an injunction directing him to refrain from selling Blackacre, then an order to surrender the $500,000 purchase price as a fine, while allowing the buyer to keep the house, would be a criminal sanction. That McNamee had received Blackacre by gift would not make the sting of the penalty one cent less than $500,000. Just so with stock.

We think it best to remand so that the district judge may either replace the remedy with rescission or explain why some punitive component is called for—and, if that component amounts to a criminal fine, offer McNamee the procedures required before an adjudication in criminal contempt.

VACATED AND REMANDED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*