In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2850

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MELVIN DOKICH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 359—**Milton I. Shadur**, *Judge.*

ARGUED NOVEMBER 3, 2009—DECIDED JULY 21, 2010

Before EASTERBROOK, *Chief Judge*, and WOOD and
TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Melvin Dokich sold stock for
Efoora, Inc., a company that claimed to be developing
diagnostic tests for HIV, mad-cow disease, and blood
glucose levels. Unfortunately, Efoora in the end was
nothing but a phony. The company invited potential
investors and customers to its headquarters in Buffalo
Grove, Illinois, where they received tours of manu-

facturing facilities staffed by temporary laborers and filled with fake test kits and empty boxes. Dokich and others who sold stock lied about Efoora's sales figures, promised that the company would soon be traded publicly, and falsely said that federal agencies were poised to approve its diagnostic tests for sale in the United States. During his time with Efoora, Dokich and his group defrauded thousands of investors of millions of dollars.

It is impossible to run such a scam forever, and Efoora was no exception. In 2006, a grand jury returned an indictment charging Dokich—along with David Grosky, Efoora's CEO, and Craig Rappin, its COO—with nine counts of mail and wire fraud, 18 U.S.C. §§ 1341 and 1343; four counts of money laundering, 18 U.S.C. § 1956(a)(1); four counts of illegal monetary transactions, 18 U.S.C. § 1957; and 33 counts of illegal structuring transactions, 31 U.S.C. § 5324(a)(3). Without reaching an agreement with the government, Dokich pleaded guilty to one count of mail fraud and all of the structuring charges. The district court sentenced him to 84 months' imprisonment and ordered him to pay $55,971,122 in restitution, jointly and severally with Grosky and Rappin. Dokich did not object to the restitution order at sentencing, but he argues on appeal that the district court plainly erred by failing to make a finding that Efoora's victims suffered $55,971,122 in actual loss. Because we find no miscarriage of justice that requires us to overturn the district court's decision, we affirm.

**I**

Dokich's challenge to the district court's restitution order requires us to delve into the details of the various estimates submitted to the court between August 2007, when Dokich entered his guilty plea, and July 2008, when he was sentenced, of the loss suffered by his victims. As of mid-2007, the government estimated that Efoora's fraud caused "approximately $35,000,000" in loss. Two months later, the government told the probation officer in charge of Dokich's presentence investigation report ("PSR") that Efoora had deprived 5,000 investors of $35 million and suggested that Dokich could have foreseen $20-50 million in loss. Based on this information, the PSR concluded that $35 million was likely to be the appropriate amount for restitution, but it noted that the government intended to provide more specific numbers at the time of sentencing.

By February 2008, the U.S. Postal Inspection Service had completed an extensive investigation of Efoora. This information prompted the government to file a new calculation of loss with the district court; in this version, it asserted that Efoora had defrauded shareholders of $57,769,237 over the course of the scheme. Of that total, $55,130,612 represented the amount for which Dokich, who had been an Account Executive from 1999 to 2006, was responsible. The filing incorporated the postal agent's detailed report, which explained how loss was calculated. First, the postal agent identified 6,000 stock certificates (representing more than 160 million shares in Efoora), which were dubbed "victim" certificates

because investors bought the securities and never saw any return. Next, the postal agent calculated the total amount paid for those outstanding securities. This figure was based on reports from investors of actual expenditures on "victim" certificates, and, where that information was not available, on the estimated amount someone would have paid for the stock based on the average share price at the time of the sale in question. The postal agent noted that the current value of Efoora's shares "was discounted to 'zero,' to maximize the recovery to investors," and so the total of $57,769,237 was simply the amount investors had paid for all outstanding shares. Along with its new calculation, the government gave the district court an appendix detailing the amounts lost by individual victims.

In March, the probation officer supplemented Dokich's PSR again. This time, it noted that even though the estimated losses had increased from $35 million to over $55 million, the government "was not seeking the [U.S. Sentencing Guidelines] enhancement for a loss of between $50,000,000 and $100,000,000." The probation officer disapproved of that decision and recommended that the district court use the $55,130,612 figure to calculate both restitution and Dokich's offense level under the guidelines. Dokich objected to the supplemental PSR; he took the position that he could have foreseen only $1 million in losses. In response, the government dismissed Dokich's estimate as meritless and reiterated that "[a]lthough the actual loss was more than $50 million, the government is not arguing for a higher guideline level."

Five days before the sentencing hearing, the government submitted a final calculation of loss to the victims and required restitution. It updated its calculation based on further review of information submitted by Efoora's victims, and it added close to $1 million in losses based on newly discovered securities called "Revenue Royalty Rights," which Efoora had sold to a number of investors. According to the final calculation, Dokich was responsible for $55,971,122.

At sentencing in July 2008, Dokich agreed to take responsibility for $10 million of fraudulent stock sales. The court, however, decided to accept the government's figures. The court noted that Efoora's victims "had invested in a situation in which they were defrauded . . . to the tune of the figures I have seen in the government's response," which reflected $20-50 million in loss. The district court used that range to calculate Dokich's sentence. Over the government's objection, the court relied on the April 2003 supplement to the guidelines. Adopting the sentencing recommendation from the supplemental PSR, the court increased Dokich's base offense level of six by 22 to reflect $20-50 million in loss, U.S.S.G. § 2B1.1(b)(1)(L), and by an additional six levels because the crime involved more than 250 victims, § 2B1.1(b)(2)(C). After reducing the range for acceptance of responsibility, the court found that Dokich's final offense level was 31, and it placed him in criminal history category I, resulting in a guidelines range of 108-135 months. The court sentenced Dokich to 84 months, below the calculated range.

At the end of the sentencing hearing, the district court turned to restitution. Noting that a restitution award was required by statute and lamenting that any award "would amount to tapping an empty barrel," the district court reviewed the government's filings on loss and the lengthy appendix detailing the experience of individual victims. At various points, the court recognized that the government had asked for restitution of "almost $56 million as to Mr. Dokich." After expressing concern that the number of victims would make restitution difficult to administer, the court concluded, "I will make the determination that the amounts of restitution are joint and several in the sum . . . that's provided by the government, $55,971,122." On the same day, the court entered a judgment and commitment order, which included restitution, and noted, "All the victims are listed in the list provided to the U.S. District Clerk's office." Dokich did not object to this part of the judgment.

We appointed Susan Kister to represent Dokich in his appeal. Unable to identify any nonfrivolous issue, Attorney Kister filed a motion to withdraw. *Anders v. California*, 386 U.S. 738 (1967). Dokich responded, arguing that even though he had received a below-guidelines sentence, the district court should have sentenced him based on $10 million in loss, not $20-50 million. Although we found no merit in that argument, we noted that there was a conflict between the order imposing restitution in the amount of $55,971,122 and the guidelines calculation, which was based on a maximum of $50 million in loss. Concluding that "[a] restitution award can never exceed the actual loss suffered by vic-

tims," we asked Attorney Kister to proceed with the appeal. She did, and we thank her for her assistance to this court and to her client.

## II

Dokich's only argument at this point is that the restitution component of the judgment cannot stand, because the court never made a finding that Efoora's victims actually lost $55,971,122. The remedy, in his view, is to vacate that order and remand for reconsideration. Because Dokich failed to object to the district court's calculations, he concedes that this court may review the decision only for plain error. *United States v. Allen*, 529 F.3d 390, 395 (7th Cir. 2008). Under that standard of review, Dokich must show that the district court committed an obvious error that affected substantial rights. *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009). If Dokich makes that showing, we have discretion to remedy the error, though the Supreme Court has recently stressed that our discretion "ought to be exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). While there were problems in the calculations of loss, we conclude that Dokich has not identified any error that resulted in the sort of miscarriage of justice that would require reversal.

The Mandatory Victims Restitution Act of 1996 ("MVRA"), requires district courts to order restitution in cases of mail fraud, among other federal crimes. 18 U.S.C. § 3663A(c)(1)(A)(ii); *United States v. Pawlinski*, 374

F.3d 536, 539 (7th Cir. 2004). The statute makes restitution available to victims of fraud to the extent that those victims would have been entitled to recover in a civil suit against the criminal. *United States v. Martin*, 195 F.3d 961, 968 (7th Cir. 1999). While restitution awards typically require a direct causal relationship between the defendant's personal conduct and a victim's loss, we have recognized that in the case of mail fraud, a crime that "involves as an element a scheme, conspiracy, or pattern of criminal activity," the MVRA imposes joint liability on all defendants for loss caused by others participating in the scheme. 18 U.S.C. § 3663A(a)(2); *Martin*, 195 F.3d at 968-69. As a result, Dokich is jointly responsible to pay restitution for all loss actually caused by Efoora's fraud.

According to Dokich, it is impossible to tell from the confused record of the proceedings below whether the district court's calculations represent actual or intended loss. Part of the problem is that the calculations are relevant to two distinct parts of the sentence: the offense level under the guidelines, and the amount of restitution that is owed. When calculating the offense level for someone convicted of mail fraud, the guidelines require courts to begin with a base level of six, § 2B1.1(a)(2), and then to increase the level according to the amount of loss caused by the scheme, see § 2B1.1(b)(1). "Loss," for this purpose, is defined as "the greater of actual loss or intended loss." § 2B1.1 cmt. n.3(A); see also *United States v. Wasz*, 450 F.3d 720, 727 (7th Cir. 2006). For restitution, on the other hand, the MVRA "implicitly requires that the restitution award be based on the amount of loss *actually caused* by the defendant's offense." *United States*

*v. Rhodes*, 330 F.3d 949, 953 (7th Cir. 2003). Thus, for restitution, the distinction between actual and intended loss was critical.

As far as we can tell, the district court never determined the higher of actual or intended loss when it calculated Dokich's guidelines range; in fact, it never said whether it was discussing actual or intended loss during sentencing. This makes it difficult to tell whether the $55,971,122 restitution figure reflects actual loss suffered by Efoora's victims or the loss that perpetrators of the scheme intended to inflict (implying that actual loss might be lower). The guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense," whereas "intended loss" is "the pecuniary harm that was intended to result from the offense," including that which "would have been impossible or unlikely to occur." § 2B1.1 cmt. n.3(A).

The government, as Dokich points out, presented varying calculations of loss before the sentencing hearing, including some materials that ambiguously referred to "intended and actual loss." But we should not place too much emphasis on a few words here or there. The evolving estimate took into account the information that was coming to light in the Postal Inspection Service's unfolding investigation of Efoora. The postal agent's reports and the government's corresponding filings provided detailed lists of investors, the amount each spent on Efoora's securities, and explanations of how the government used this data to calculate its final estimates. These documents make reasonably clear

that both the postal agent and the U.S. Attorney's Office intended to provide the district court with a figure representing actual loss. Contrary to Dokich's suggestion, the fact that the government included the amount paid for so-called "Revenue Royalty Rights" in its final calculation is not evidence that the final number incorporated intended loss. Investors who bought Revenue Royalty Rights paid $2,500 for the right to 2% of Efoora's revenues over a five-year period. The government determined that dozens of investors paid a total of $847,500 for these royalty contracts, and it added that figure to the amount that Efoora's victims spent on stock contracts, yielding a final estimate. By including the amount that Efoora made selling Revenue Royalty Rights, the government was not presenting evidence that Dokich (or any other person involved in Efoora's fraudulent acts) intended to inflict additional, unrealized pecuniary harm. See *United States v. Middlebrook*, 553 F.3d 572, 578 (7th Cir. 2009) ("In determining the intended loss amount, the district court must consider the defendant's subjective intent."). Instead, the out-of-pocket amount that investors paid for royalty contracts, like the amount that they paid for stock contracts, represented actual loss to Efoora's victims.

If the court had made it clear that the $55.9 million represented actual loss, and then it had used the same number for both the offense level and restitution, we would probably not be here. But it did not, and the confusion only deepened when it decided to use a *higher* loss amount for restitution than it did for the guidelines calculation. We have recognized that "[a] court could

find that a defendant intended a large amount of loss for sentencing purposes, but then order a much-reduced amount in restitution in light of the actual losses suffered by the victims." *Allen*, 529 F.3d at 396-97. That result should occur whenever intended loss exceeds actual loss and restitution is imposed. Strictly speaking (by which we mean considering the guidelines before 18 U.S.C. § 3553(a) enters the picture), the opposite is impossible: because courts must rely on the greater of intended or actual loss to calculate a guidelines sentence, a restitution order should never exceed the loss used to calculate a sentence. The district court ignored that rule, basing Dokich's guidelines calculation on $20-50 million in loss while imposing $55,971,122 in restitution. If the latter number was the higher of actual or intended loss, then the advisory guideline range should have been based on it, and it was error not to do so. While district courts enjoy sentencing discretion after *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court requires them to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Gall v. United States*, 552 U.S. 38, 49 (2007). Had the district court used the same figure to calculate Dokich's sentence as it did for restitution purposes, Dokich's guidelines range would have been 135-168 months, not 108-135 months. Compare § 2B1.1(b)(1)(L), with § 2B1.1(b)(1)(M). Because the government did not take an appeal, however, and Dokich has nothing to gain from a higher advisory guidelines range, we will not consider this point further.

   Perhaps the district court, by deliberately basing its guidelines calculation on a lower amount of loss,

intended in this way to give Dokich a break. If this was its intent, however, the way to achieve that goal would have been to explain why under § 3553(a) it deemed a lower sentence to be reasonable. But here is where the plain error standard has teeth. Nothing about the district court's decision to give Dokich a slightly lower term of imprisonment casts doubt on the fact that the court made a specific finding about the actual loss that Efoora's fraudulent operations caused. The court had the government's calculations of loss, the postal agent's reports, and the long appendix of individual victims in hand when it ordered restitution "in the sum . . . that's provided by the government, $55,971,122." We see nothing in the record that would support a finding that this was anything but the court's determination of the actual loss suffered by Efoora's victims. Indeed, nothing in the record suggests there was some amount of intended loss greater than the loss actually inflicted.

We note in concluding that Dokich has not argued that the district court used the wrong methodology in calculating actual loss. The focus in calculating actual loss must be on net detriment to the victims, rather than the gross amount of money that changes hands. *United States v. Mount*, 966 F.2d 262, 265 (7th Cir. 1992) (interpreting § 2F1.1 in the 1990 guidelines, now incorporated in § 2B1.1); see also *United States v. Vivit*, 214 F.3d 908, 915 (7th Cir. 2000). The defendant's gain from an offense should be used "as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." § 2B1.1 cmt. n.3(B); see also *United States v. Serpico*, 320 F.3d 691, 698 (7th Cir. 2003). Similarly, in the context of

restitution awards, the government's evidence of actual loss must deduct any financial benefit realized by victims of the fraud. *Allen*, 529 F.3d at 396-97; *United States v. Swanson*, 483 F.3d 509, 515-16 (7th Cir. 2007).

It is conceivable that the district court's finding with respect to the total amount of actual loss is overstated by a small amount. Efoora's fraud consisted of convincing investors to buy securities at a price higher than their value. At oral argument, the government noted that Efoora sold products overseas, creating a meager revenue stream. In addition, Efoora apparently had at least some assets. This means that at least some of the Efoora stock sold was worth something. While the government points out that it discounted its estimate of loss by the amount Efoora paid back to investors before its crime was discovered, see Application Notes 3(E) and 3(F)(iv) to § 2B1.1, there is no evidence that the postal agent, the government, or the district court adjusted the investors' loss to take account of the value of the securities they bought. In fact, the postal inspector said the value of Efoora's stock "was discounted to 'zero,' to maximize the recovery to investors." Perhaps in the end this was a reasonable estimate. Again, we need not pursue the possibility, because Dokich has not relied on it. *E.g.*, *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002).

Although we are well aware that it is not the court's job to decide which charges to bring, we expressed some surprise at oral argument that this case was not prosecuted as a securities fraud. Section 5 of the Securities Act of 1933 requires a valid registration statement before

securities are sold in or by means of interstate commerce, 15 U.S.C. § 77e, and it does not appear that Efoora meets any of the exemptions to that requirement, see generally *United States v. Spirk*, 503 F.3d 619, 620-21 (7th Cir. 2007). Sections 11 and 12 of the 1933 Act make rescission the usual remedy for the sale of unregistered stock. 15 U.S.C. §§ 77k(e), 77l(a). In a securities-fraud prosecution, there would have been no doubt about how much Efoora owed its victims: rescission would have permitted the defrauded investors to return securities purchased in exchange for the price that they had paid. *S.E.C. v. McNamee*, 481 F.3d 451, 457 (7th Cir. 2007). If the government had prosecuted the case as securities fraud, the calculation of loss that it submitted to the district court would have been exactly right.

Finally, there is good reason to believe that remanding this case for a re-evaluation of the amount Dokich owes as restitution would not make any practical difference. Whether he is ordered to pay $55,971,122, $55.1 million (the amount in the order less Efoora's gains from Revenue Royalty Rights), or $10 million (the amount Dokich himself conceded was due), the odds that he will repay his debt appear to be slim. Dokich will be close to 70 years old when he is released from prison. The judgment order specified that he would then be required to make payments on this debt "in an amount of 15% of [his] net monthly income." Our decision in *United States v. Sawyer*, 521 F.3d 792, 797-98 (7th Cir. 2008), shows why that number is probably too low, as an actuarial matter, but once again the government has not raised this as a point on appeal and Dokich has no incen-

tive to complain. When we asked about Dokich's ability to pay at oral argument, his attorney said there was virtually no chance he would ever pay a single penny to his victims. If that proves to be true, Dokich can always avail himself of the procedure set forth in 18 U.S.C. § 3664(k) and seek a modification of his schedule; by the same token, if he turns out to have resources that would permit more substantial payments, his payments can be adjusted upward, *id.* and § 3664(n).

We conclude that the district court did not plainly err when it included a requirement that Dokich pay $55,971,122 in restitution to his victims. We therefore AFFIRM the court's judgment.