In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-2630

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES KENNEDY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 CR 009 — **Joan B. Gottschall**, *Judge.*

ARGUED FEBRUARY 25, 2013 — DECIDED AUGUST 9, 2013

Before BAUER, POSNER, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* James Kennedy pleaded guilty to mail
fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and
threatening an informant, 18 U.S.C. § 1513(b), for his role in a
scheme to sell counterfeit art. The district court sentenced him

to 96 months' imprisonment and ordered him to pay restitution in the amount of $316,425.65. On appeal, Kennedy challenges the district court's Sentencing Guidelines calculation as to loss amount and number of victims as well as the restitution amount. We affirm.

## I. BACKGROUND

From 2000 to 2008, Kennedy was involved in a scheme to sell counterfeit fine art prints of well-known artists, including Alexander Calder, Salvador Dali, Marc Chagall, Roy Lichenstein, Joan Miro, and Pablo Picasso. The prints Kennedy sold bore forged signatures or false markings that made the prints appear as if they were part of an original limited edition or prepared for the artist's own use. Kennedy obtained many prints knowing they had forged signatures and markings, and sometimes Kennedy himself forged the signatures of the artists on the prints or added other markings indicative of an original limited edition print. Kennedy then sold the prints on eBay and at art shows throughout the country, representing to customers that the prints were genuine limited edition prints signed and authorized by the artists.

On March 18, 2008, a grand jury returned a superseding indictment charging Kennedy with three counts of mail fraud, in violation of 18 U.S.C. § 1341, three counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of threatening bodily harm to a witness, in violation of 18 U.S.C. § 1513(b). Kennedy pleaded guilty to all counts on September 23, 2010.

Kennedy's sentencing was originally set for August 3, 2011. At the sentencing, the parties disagreed on the number of victims and the loss amount for the fraud, so the district court

set a hearing to permit the parties to present evidence regarding the number of victims, loss amount, and restitution. The district court held hearings on September 16, 2011, October 21, 2011, June 20, 2012, and June 29, 2012, to resolve these issues.

At the hearings on September 16 and October 21, the government argued that the loss amount in this case exceeded a million dollars, and was likely far greater, and presented testimony from two witnesses in support. FBI Special Agent Brian Brusokas, a case agent who was involved in investigating Kennedy and the fraudulent art scheme, testified regarding interviews with Kennedy in January and February 2007. At one interview, on January 17, 2007, after initially denying that he knowingly sold fraudulent artwork, Kennedy admitted to engaging in such conduct and told Agent Brusokas that he had forged various artists' signatures "hundreds of times." In an interview the following month, Kennedy said that he had three primary sources of fraudulent artwork: Leon Amiel, Jr., Michael Zabrin, and Giuseppe Concepcion. Kennedy said that he had paid Concepcion approximately $500,000 for fraudulent artwork. Agent Brusokas also testified regarding an interview with Zabrin, who said that he and Kennedy had traded fake artwork back and forth over the years. The Milwaukee Police Department, which had investigated Kennedy for selling fraudulent art in 2004, provided Agent Brusokas an invoice for a single transaction of fraudulent art between Kennedy and Zabrin that had an estimated value of $129,600. Agent Brusokas also testified that Zabrin said he marked the price of counterfeit art up for resale by approximately three times the wholesale price he paid.

U.S. Postal Inspector John Donnelly also testified regarding his investigation of the fraudulent art scheme. He said that over the course of his multi-year investigation, he consulted with art experts and participants in the counterfeit art scheme to identify the counterfeit prints. He then identified sales of prints he believed were fake using Kennedy's business records from November 2005 to January 2007, including sales invoices, copies of checks and credit card receipts, and bank statements, and estimated that there were at least $744,108 of sales attributable to fraudulent art for this fifteen-month period.

Inspector Donnelly also reviewed records from the accounting firm that prepared tax returns for Kennedy's business since at least 2000, from which he obtained the total sales amounts Kennedy reported for 2000 through 2005: $721,019 in 2000; $389,862 in 2001; $398,920 in 2002; $369,191 in 2003; $453,126 in 2004; $630,124 in 2005. For the years 2000 through 2002, Inspector Donnelly obtained detailed schedules of invoices for the sales of some of the artwork sold by Kennedy, and based on his knowledge from the investigation, identified the sales of counterfeit art. He estimated that between 2000 and 2002, at least $255,550 of sales were related to counterfeit artwork.[1] Inspector Donnelly also estimated $285,000 in counterfeit art sales in 2004, and identified $35,407 in counterfeit art sales based on eBay records from 2005 and 2006. Additionally,

---

[1]   Because the documents were incomplete, the information pertained to only a portion of the total sales for the year. For example, in 2002, the documents indicated $398,000 in total sales, but there were only detailed invoices for about $125,000 of the sales, and of that $125,000, Inspector Donnelly identified $90,275 in sales of counterfeit art. There were no invoices for the period of 2003 to 2005.

Inspector Donnelly testified that he had identified $73,375 in counterfeit art sales based on information from victims whose purchases were not evident in the available records, but who contacted the government during the investigation.

Kennedy contended that the loss amount was less than $1,000,000. He argued that many of the documents and records upon which Inspector Donnelly relied for his calculations were not reliable and that a much smaller percentage of Kennedy's sales were of counterfeit art than the government estimated.

At the end of the second hearing, the district court found that the loss amount exceeded $1,000,000 and applied an enhancement under § 2B1.1(b)(1)(I). In support of this loss amount, which the district court noted was imprecise, the district court relied upon Kennedy's admission that he paid one of his three suppliers $500,000 for fraudulent art, and that he then marked up the price of the art by at least twice what he paid, and sometimes even ten times as much as he paid. The district court also considered the calculations of Inspector Donnelly, whose estimates of Kennedy's sales of fraudulent art from 2000 to 2007 exceeded $1,000,000 and did not include the sales of fraudulent art from periods from which records were not available and any sales Kennedy conducted in cash.

When the district court asked whether there were any remaining objections to the PSR, Kennedy's attorney mentioned that the PSR calculated 312 victims, but that only 130 victims had responded to the government during its investigation, and that many of those victims had only lost around $300. The district court agreed that the victims in this case were not harmed as seriously as is common in cases where the number-

of-victims enhancement is applied and stated that it would take that into account under the 18 U.S.C. § 3553(a) factors. The district court indicated, though, that it suspected that "there probably are 250 victims." Kennedy's attorney then said, "I'll back off on that." The district court accordingly adopted the PSR's calculation that the number of victims was at least 250 and applied a six-level enhancement under U.S.S.G. § 2B1.1(b)(2)(c). After the loss amount and number-of-victim enhancements, the resulting Guidelines range was 108 months to 135 months. The district court considered the § 3553(a) factors and ultimately imposed a sentence of 96 months' imprisonment.

At the end of the hearing, when the district court turned to the issue of restitution, the parties agreed to submit further briefing on the issue because the government had not yet completed a list specifying each victim and the corresponding loss. The government submitted additional briefs on October 28, 2011, and November 18, 2011. In the submissions, the government provided a list of 135 victims' names, addresses, and loss amounts, and requested restitution totaling $821,714.65. The government relied upon the evidence it provided at sentencing to prove loss amount for purposes of the Sentencing Guidelines but did not submit any additional evidence supporting the loss amount claimed for each named victim for purposes of restitution. The district court accordingly issued an order on June 8, 2012, indicating that the government had failed to establish by the preponderance of the evidence actual losses by specific victims as required by 18 U.S.C. § 3664(e), with the exception of two victims. The district court gave the government an opportunity to submit addi-

tional evidence as to the other victims it identified, such as proof that the transactions listed on invoices in the government's possession occurred, that the victim had not returned the artwork, and that any money obtained through a restitution order could be returned to the victim. The government then produced a reduced list of 41 victims' names and requested a revised total restitution amount of $469,131.65. In support of the requested amount, the government submitted several files of documents on the eve of the restitution hearing, which was held on June 20 and June 29, 2012. The district court sifted through the documents, which included bank records, victim questionnaires, copies of cancelled checks, and other financial records, and ultimately found that the government had met its burden as to 21 victims and ordered Kennedy to pay $316,425.65. The district court rejected the government's request as to twenty victims for a variety of reasons, including a complete lack of evidence to support the restitution request in six cases, insufficient evidence to support the requested loss amount in thirteen cases, and in one case, a lack of evidence that the identified party had purchased fraudulent art from Kennedy.

## II. DISCUSSION

Kennedy appeals the restitution award and the loss amount and number of victims the district court used to enhance his sentence. We address each in turn.

### A. Restitution

The Mandatory Victims Restitution Act of 1996 requires that a court sentencing a defendant for certain crimes in which "an identifiable victim … has suffered a … pecuniary loss"

must order that the defendant make restitution to the victim of the offense. 18 U.S.C. §§ 3663A(a)(1), (b)(1), (c)(1).

The amount of restitution is limited to the actual losses caused by the specific conduct underlying the offense, *see* 18 U.S.C. § 3663A(a); *United States v. Dokich*, 614 F.3d 314, 319 (7th Cir. 2010), and the government must establish the loss amount by the preponderance of the evidence. 18 U.S.C. § 3664(e); *United States v. Hosking*, 567 F.3d 329, 333 (7th Cir. 2009). We review a district court's calculation of restitution for abuse of discretion, viewing the evidence in the light most favorable to the government. *United States v. Hassebrock*, 663 F.3d 906, 925 (7th Cir. 2011) (citations omitted).

Kennedy contends that the district court's restitution calculation lacked sufficient evidentiary support, pointing to the dwindling nature of the government's request for restitution over the course of the sentencing and restitution proceedings. As we have noted, the government's request for restitution fell from $821,714.65 for 135 victims to $468,131.65 for 41 victims, and the district court ultimately ordered $316,425.65 paid to 21 victims. Additionally, the government failed to provide any specific support for its initial requested restitution amount for each victim, and when given a chance by the district court to support its request, provided the evidence to the district court in a haphazard manner.[2]

---

[2] Even in its final submission, the district court was unable to locate any records that supported the government's request as to six of the victims on the government's list.

We agree with Kennedy that the government's handling of its restitution request in this case was difficult to follow. The restitution amount sought in a case may evolve as the government obtains more information during its investigation. *E.g. Dokich*, 614 F.3d at 316–17. Here, though, the government revised its request not because of additional evidence, but because the district court reminded the government of its burden of proof. Nonetheless, the government's less-than-ideal handling of its restitution request does not mean that the final amount determined by the district court lacked evidentiary support. Fortunately for the government, the district court here went to great lengths to sort through the disorganized record to ensure that its calculation of restitution was precise and victim-specific, relying upon sworn complaints submitted to the government, copies of invoices indicating that payment was made, victim interviews by postal inspectors, copies of bank records, and copies of cancelled checks.

Kennedy's only specific challenge to the calculation of the restitution amount pertains to the $247,000 awarded to one victim, Linden N.[3] The district court found that Linden N. suffered an actual loss of this amount based on Inspector Donnelly's testimony that Linden N. told Inspector Donnelly that "he was out" $240,000; a copy of a fax sent from Kennedy to Linden N. that states "You gave me 75,000 money[,] 60,000

---

[3]   Kennedy raises specific arguments regarding the restitution amounts awarded to eleven of the victims in his reply brief, taking issue with the evidence the district court relied upon to determine the loss amount for each victim. Arguments raised for the first time in a reply brief, however, are waived. *Broaddus v. Shields*, 665 F.3d 846, 854 (7th Cir. 2011).

watch[,] 22,000 auto[,] 90,000 watch[e]s"; and that the govern-ment seized 23 pieces of art from Linden N. that were deemed to be fakes. The government also submitted three sets of invoices for sales of art by Kennedy to Linden N. totaling $375,960.[4]

Kennedy contends that this evidence was unreliable and argues that the amount awarded to Linden N. reflects only an "approximation" for his loss as opposed to his actual loss. We disagree. While Linden N. offered "approximations" of what he paid Kennedy to the FBI investigators during his interviews (according to Inspector Donnelly, Kennedy said he "was out" around $240,000; the records from his FBI interview said he had lost about $250,000), the final amount reached by the district court was supported by the fax Kennedy sent Linden N., which listed $247,000 worth of money and goods Linden N. paid Kennedy. While this was clearly not an orthodox transaction or typical invoice, Kennedy fails to convince us that the district court erred in relying upon it in determining that Linden N. paid Kennedy $247,000 for artwork that turned out to be fraudulent. We therefore conclude that the district court did not abuse its discretion in ordering Kennedy to pay $316,425.65 in restitution to his victims.

---

[4]    Linden N. told the government that he was not owed that full amount because he had not paid Kennedy for some of the art and had returned some of the pieces.

### B. Loss Calculation and Number of Victims

Kennedy next challenges the district court's factual findings regarding the loss amount and number of victims used for sentencing. We review a district court's factual determinations at sentencing for clear error. *United States v. McKinney*, 686 F.3d 432, 434 (7th Cir. 2012). To establish clear error, Kennedy must show that the district court's determination "was inaccurate and outside the realm of permissible computations." *United States v. Borrasi*, 639 F.3d 774, 783 (7th Cir. 2011) (citation omitted).

On appeal, Kennedy rehashes many of the arguments he made regarding loss amount before the district court, including that the documents and records that Inspector Donnelly used for his calculations were not reliable. Specifically, Kennedy contends that Inspector Donnelly's use of invoices was problematic because the invoices may document sales that were never consummated or sales in which the artwork was returned to Kennedy, as in the case of Linden N. The district court recognized this possibility, however, but noted that even if the invoices might overstate the actual loss, the invoices were evidence of Kennedy's intent to sell the fake pieces of artwork listed on the invoice, and the invoice amounts were therefore accurate indicators of intended loss. *See Dokich*, 614 F.3d at 318–19 (noting that unlike with restitution, "loss" for purposes of calculating the offense level for someone convicted of mail fraud under the Sentencing Guidelines is defined as "the greater of actual or intended loss" under § 2B1.1(b)(1)). Additionally, in arriving at the loss amount, the district court gave only limited weight to Inspector Donnelly's calculations and primarily relied upon Kennedy's own admissions regard-

ing the amount he had spent purchasing counterfeit art from just one dealer—$500,000—and then marked up before selling to his customers. Kennedy identifies no problems with the district court's reliance on these admissions, and we therefore find no error in the district court's determination that the loss amount exceeded $1,000,000.

We likewise reject Kennedy's contention that the district court erred in finding that Kennedy's offense involved 250 or more victims because he waived any objection to the finding at sentencing. Waiver is the intentional relinquishment or abandonment of a known right, and forfeiture is the failure to make a timely assertion of a right. *United States v. Irby*, 558 F.3d 651, 655 (7th Cir. 2009) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)). The waiver of a right precludes appellate review, but when the right is merely forfeited, we may review the district court ruling for plain error. *Id.* While "[w]aiver principles must be construed liberally in favor of the defendant," *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010) (citation omitted), we find waiver "when there are sound strategic reasons explaining why counsel would elect to pursue a route as a matter of strategy." *Swanson v. United States*, 692 F.3d 708, 716 (7th Cir. 2012) (internal quotation marks and citations omitted).

As we noted above, Kennedy's attorney expressed concern that only 130 victims had come forward during the government's investigation, but he "back[ed] off" this argument after the district court indicated that it would be receptive to an argument from Kennedy under the § 3553(a) factors that while the fraud in this case involved a significant number of victims, they had been defrauded only a relatively small amount. By

making this strategic decision to abandon his objection to the calculation of the number of victims and instead focus on arguments in mitigation under the § 3553(a) factors, Kennedy waived his objection to the finding that the offense involved more than 250 victims. *See United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005) ("There may be sound strategic reasons why a criminal defendant will elect to pursue one sentencing argument while also choosing to forgo another, and when the defendant selects as a matter of strategy, he also waives those arguments he decided not to present."). We accordingly decline to review Kennedy's arguments regarding the number-of-victims enhancement under U.S.S.G. § 2B1.1(b)(2)(C).

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.