**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,
                    *Plaintiff-Appellee,*

          v.

PLATFORMS WIRELESS
INTERNATIONAL CORPORATION;
WILLIAM C. MARTIN; ROBERT D.
PERRY; FRANCOIS M. DRAPER;
CHARLES B. NELSON,
          *Defendants-Appellants.*

No. 07-56542

D.C. No.
CV-04-02105-JTM

SECURITIES AND EXCHANGE
COMMISSION,
                    *Plaintiff-Appellant,*

          v.

PLATFORMS WIRELESS
INTERNATIONAL CORPORATION;
WILLIAM C. MARTIN; ROBERT D.
PERRY; FRANCOIS M. DRAPER;
CHARLES B. NELSON,
          *Defendants-Appellees.*

No. 09-55039

D.C. No.
3:04-cv-02105-
JM-AJB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted
June 8, 2010—Pasadena, California

Filed July 27, 2010
Amended August 16, 2010

11753

Before: Dorothy W. Nelson and Ronald M. Gould,
Circuit Judges, and David D. Dowd, Jr.,
Senior District Judge.*

Opinion by Judge Gould

---

*The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

## COUNSEL

Stanley C. Morris (argued), Corrigan & Morris LLP, Santa Monica, California; Thoms M. Brown, Kenneth P. White, and George P. Schiavelli, Brown, White & Newhouse LLP, Los Angeles, California for defendant-appellant and cross-appellee William C. Martin.

Daniel L. Rasmussen, Benjamin A. Nix, and Erik M. Andersen, Payne & Fears LLP, Irvine, California, for defendant-appellant and cross-appellee Platforms Wireless International Corp.

Mark Pennington (argued), David M. Becker, Mark D. Cahn, Michael A. Conley, and Catherine A. Broderick, Securities and Exchange Commission, Washington, D.C., for plaintiff-appellee and cross-appellant Securities and Exchange Commission.

## ORDER

The opinion filed on July 27, 2010, and published at ___ F.3d ___, 2010 WL 2902393, is AMENDED as follows.

The second sentence in the first paragraph on page 10765 of the slip opinion states:

> We conclude, however, that Section 1961 provides an appropriate interest rate in this case.

The word "appropriate" is replaced with the word "inappropriate" so that the sentence now reads:

> We conclude, however, that Section 1961 provides an inappropriate interest rate in this case.

**IT IS SO ORDERED.**

---

## OPINION

GOULD, Circuit Judge:

This appeal concerns a civil enforcement action filed by the Securities and Exchange Commission ("SEC"). After concluding that there were securities law violations, the district court entered a final judgment under Federal Rule of Civil Procedure 54(b) pursuant to a partial summary judgment against Platforms Wireless International Corporation ("Platforms") and William Martin ("Martin"), its former Chairman and CEO. The district court held that Martin and Platforms sold unregistered securities to the public in violation of the registration provisions of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and that they issued a fraudulent press release in August 2000 in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. The district court ordered Platforms and Martin jointly and severally to disgorge about $1.75 million in proceeds from the sales that violated Section 5, plus almost $1 million in prejudgment interest. The court denied summary judgment on the SEC's allegations that Martin and Platforms also violated Section 10(b) and Rule 10b-5 by issuing five other press releases between May 2000 and March 2001. Martin and Platforms appeal the partial summary judgment and disgorgement order; the SEC cross-appeals the partial denial of summary judgment. We affirm the partial summary judgment and disgorgement order, and we dismiss as moot the SEC's cross-appeal.

# I

Platforms is an Oklahoma corporation whose stock is not registered with the SEC under the Securities Act of 1933 ("Securities Act"). Since March 2000, Platforms' stock has been traded on the Pink Sheets, now known as Pink Quote, an inter-dealer electronic quotation and trading system for registered and unregistered securities.[1]

At relevant times Platforms was working to develop a new technology, called the "ARC System," to provide cellular communications services to large geographic territories. Platforms represented that its ARC System would be a low-cost alternative to ground-based cellular antenna towers or satellites. The ARC System was to be comprised of two components: (1) a portable antenna payload, which would receive radio frequency signals from devices such as cellphones and consolidate and relay those signals to ground stations; and (2) aircraft to carry the antenna payload, either several airplanes flying in rotating shifts or an aerostat (a lighter-than-air aircraft). It is undisputed that Platforms never built or tested a completed ARC System, although by March 5, 2001, it had built and conducted limited ground-based testing on a prototype payload.

Between 1998 and January 17, 2000, William Martin owned and operated a sole proprietorship called Intermedia Video Marketing Company ("Intermedia"). During that time, Martin provided consulting services to Platforms as an employee of Intermedia, but he was otherwise unaffiliated with Platforms. Martin alleges that in exchange for those consulting services, Intermedia earned at least 17.45 million unregistered shares of Platforms stock but that those shares were not then issued to Intermedia.[2]

---

[1]*See* OTCMarkets.com, About Pink OTC Markets, http://www.otcmarkets.com/pink/about/index.jsp (last visited May 28, 2010).

[2]The SEC conceded for purposes of summary judgment that Intermedia earned and "beneficially owned" the shares.

Martin became the Chairman and CEO of Platforms in March 2000. Before that event, in January 2000, Martin transferred his ownership interest in Intermedia to his former wife as part of a divorce settlement. Martin remained an officer of Intermedia after the transfer and continued to take actions on behalf of Intermedia, including: (1) applying for a business Visa credit card for Intermedia; (2) executing a document that authorized Martin to transfer and sell "any and all . . . securities . . . in the name of or owned by" Intermedia; (3) keeping open and using a joint Intermedia/Platforms checking account; and (4) selling Platforms stock from a brokerage account registered to "Intermedia Video Marketing Corp.; Attn: William C. Martin." Martin executed some of the above documents in his capacity as Intermedia's "President" or "President and CEO."

In August of 2000, Platforms issued a press release declaring that Platforms "Unveils New Airborne Wireless Communications 'ZeroGravity AeroStructures.' " The press release described technical details and performance characteristics of five discrete AeroStructure models. When the press release was issued, Platforms had only a description of how the ARC System would operate and did not have prototypes built, nor even the money to build a prototype.

In two transactions in September 2000 and February 2001, Platforms transferred 17.45 million of the unregistered shares to Intermedia in payment for its consulting services. Three million of those shares were issued to Francois Draper, Platforms' then-Executive Vice President, Chief Operating Officer, and Chief Technology Officer. The remaining 14.45 million shares went to Benefit Consultants, a company affiliated with Charles Nelson, Platforms' Chief Financial Officer and a member of its board of directors. When the shares were issued, Intermedia executed documents transferring its "beneficial ownership" of those shares to Draper and Benefit Consultants. Platforms' General Counsel, Forrest Walworth Brown ("Brown"), issued opinion letters stating that the trans-

fers complied with a safe harbor from Securities Act registration violations. Shortly after receiving the shares, Draper and Benefit Consultants sold them to the public.

The SEC alleges, and the defendants do not dispute, that the proceeds from Draper's and Benefit Consultants' public stock sales totaled $1,756,861. Martin testified that the shares were sold with the understanding that the money would pay for Platforms' operating expenses and other obligations, including certain employee salaries. It is not disputed that at least some of the money was thus spent.

The SEC filed this civil enforcement action in federal district court in October 2004 against Platforms, Martin, and several other Platforms officers and directors.[3] The SEC alleged that Platforms, Martin, and Draper violated Section 5 of the Securities Act by selling to the public the 17.45 million unregistered Platforms securities "beneficially owned" by Intermedia.[4] The SEC further alleged that the defendants committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 by issuing six materially misleading press releases between May 2000 and March 2001, including the August 2000 press release suggesting that a working ARC System had been developed when none in fact existed.[5]

In a series of orders, the district court granted the SEC partial summary judgment on its Section 5 claim, and on its Section 10(b) claim based on the August 2000 press release. First, in a January 2007 order, the district court granted the SEC's motion for summary judgment on the Section 5 claim. It concluded that the SEC had established prima facie Section 5 violations by showing that unregistered securities were sold to

---

[3]The other officers and directors entered into consent judgments with the SEC and are not parties to this appeal.

[4]We hereinafter refer to this as the "Section 5" claim.

[5]We hereinafter refer to these claims as "Section 10(b)" claims.

the public without an exemption. The court further concluded that because Martin controlled Intermedia at the time of the transactions, and because the defendants did not take reasonable care to assure that Intermedia was not an underwriter, the 17.45 million in stock transfers did not qualify for a registration exemption. Then, in an April 2007 order, the district court granted in part the SEC's motion for summary judgment on the Section 10(b) claims based on four of the six press releases, including the August 2000 press release, and denied summary judgment on the two remaining press releases. In a subsequent order, the district court held Martin and Platforms jointly and severally liable for the Section 5 violations and ordered them to disgorge the total proceeds from the sales, $1,756,861, plus prejudgment interest.[6] Interest was calculated according to the federal tax underpayment rate set forth in 26 U.S.C. § 6621(a)(2), which is higher than the treasury-bill rate declared in 28 U.S.C. § 1961. The treasury-bill rate is the rate typically used in most cases for prejudgment interest calculation.

The defendants moved for reconsideration of the summary judgments under Federal Rules of Civil Procedure 59(e) and 60(b), alleging defects in the district court's decisions. Among these defects, the defendants alleged that the district court had used the wrong standard for "reckless" scienter under Section 10(b) and Rule 10b-5 by determining only whether the misrepresentations in the press releases were objectively unreasonable, rather than "deliberately reckless" in accord with our decision in *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999). The district court granted the motion in part and ordered supplemental briefing with respect to the "deliberate recklessness" standard, but denied the reconsideration motion with respect to the other issues raised.

---

[6]The district court also imposed civil monetary penalties on Martin and Platforms, and an injunction against them prohibiting, inter alia, further violations of the securities laws. Those penalties are not at issue in this appeal.

On April 3, 2008, the district court partially vacated its April 2007 summary judgment on the SEC's Section 10(b) claims. The district court reaffirmed, under the "deliberate recklessness" standard, summary judgment on the August 2000 press release. The district court then concluded, however, that there were genuine issues of material fact whether the defendants had acted with "deliberate recklessness" with respect to the other three press releases on which summary judgment had been previously granted.

The SEC was left with a summary judgment on its Section 5 claim and one of its six Section 10(b) claims. The SEC then moved for entry of final judgment under Federal Rule of Civil Procedure 54(b), indicating its satisfaction with the relief awarded and its intent to abandon the remaining Section 10(b) claims if the judgment was affirmed on appeal. The district court granted the SEC's motion, finding "no just reason for further delay."

Martin and Platforms timely appealed, and the SEC timely cross-appealed. Martin and Platforms challenge the summary judgments on the Section 5 claim and the Section 10(b) claim based on the August 2000 press release, the disgorgement order, the calculation of prejudgment interest, and the denial of their motion for reconsideration. The SEC by its cross-appeal challenges the denial of summary judgment on the remaining five press releases.

## II

**[1]** Platforms questions the propriety of the district court's Rule 54(b) judgment resting on the underlying partial summary judgment. Rule 54(b) permits a district court to enter judgment on "fewer than all" claims or parties where there is "no just reason for delay." Fed. R. Civ. P. 54(b); *Am. States Ins. Co. v. Dastar Corp.*, 318 F.3d 881, 889-90 (9th Cir. 2003). A properly entered Rule 54(b) judgment is a "final" appealable judgment for purposes of 28 U.S.C. § 1291. *Id.*

Reviewing the propriety of a district court's Rule 54(b) certification is a two-step process. *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 954 (9th Cir. 2006). In the first step, we review de novo "such factors as the interrelationship of the claims so as to prevent piecemeal appeals." *Id.* (quotation marks omitted). "The second step . . . requires an assessment of the equities [under] the 'substantial deference' standard, reversing the district court['s Rule 54(b) certification] only if we find the district court's conclusions clearly unreasonable." *Id.* Analyzing a Rule 54(b) judgment requires a "pragmatic approach" with focus "on severability and efficient judicial administration." *Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987).

**[2]** We conclude that the district court properly entered a Rule 54(b) final judgment on the Section 5 and Section 10(b) claims on which it granted summary judgment.[7] The SEC expressly indicated to the district court that it was satisfied with the partial summary judgment and the relief it received, and that it did not wish to pursue its remaining Section 10(b) claims. Moreover, as noted above, all other defendants in the matter have settled with the SEC. The Rule 54(b) judgment therefore ended all litigation in the case, and it will not "inevitably come back to this court on the same set of facts." *Wood v. GCC Bend, LLC*, 422 F.3d 873, 879 (9th Cir. 2005). In light of the above, the district court's decision was neither "clearly unreasonable" nor inequitable. The district court's judgment is final pursuant to 28 U.S.C. § 1291, and we have

---

[7]We express no opinion whether 28 U.S.C. § 1291 confers jurisdiction to review the denial of summary judgment on the SEC's Section 10(b) claims relating to five press releases. *See Safe Flight Instrument Corp. v. McDonnell-Douglas Corp.*, 482 F.2d 1086, 1093 (9th Cir. 1973) ("Ordinarily the denial of a motion for summary judgment is not appealable, even where there has been an express direction and determination of the kind called for by Rule 54(b) . . . ."). The SEC has elected not to pursue its cross-appeal if the partial summary judgment is affirmed. Because we uphold the partial summary judgment, we dismiss the cross-appeal as moot.

jurisdiction to review the issues raised by Martin and Platforms on direct appeal.

## III

We now consider the defendants' challenge to the district court's grant of partial summary judgment on the SEC's Section 5 and Section 10(b) claims. We review summary judgments de novo, construing the evidence in the light most favorable to the nonmoving party. *SEC v. Talbot*, 530 F.3d 1085, 1090 (9th Cir. 2008).

## A

**[3]** Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c), make it unlawful to offer or sell a security in interstate commerce if a registration statement has not been filed as to that security, unless the transaction qualifies for an exemption from registration. The district court held, and the parties do not dispute, that the chain of transactions leading to the sale to the public of 17.45 million unregistered Platforms securities was a prima facie violation of Section 5. The parties dispute only whether the transactions qualified for an exemption from the registration requirement.

The registration requirement arose with the 1933 Securities Act. It was designed to be a principal statutory tool for protecting the public. The mischief aimed at was rampant fraud in the sale of securities to the financially unsophisticated public. *See* Securities Act of 1933, Pub. L. No. 73-22, pmbl., 48 Stat. 74, 74 (1933) (stating that the purpose of the Act is "to prevent frauds in the sale" of securities); 1 Thomas Lee Hazen, The Law of Securities Regulation 34 (6th ed. 2009). By imposing a registration requirement, Congress put the burden on companies issuing securities to inform truthfully the public about themselves and the securities being issued. *A.C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38, 40 (1941); Milton H. Cohen, *"Truth in Securities" Revisited*, 79

Harv. L. Rev. 1340, 1345 (1966). Companies that have registered securities under the Securities Act must also abide a regime of regular reporting of material information established in the Securities Exchange Act of 1934. *See* 15 U.S.C. §§ 78l, 78m, 78o(d).

Most securities litigation in modern times focuses not on registration, but rather on whether disclosures by companies were accurate or, to the contrary, withheld or misstated information. *See, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005); *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995); *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286 (1993); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991); *Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *Schreiber v. Burlington N., Inc.*, 472 U.S. 1 (1985); *Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002). When a company fails entirely to register its securities and nonetheless proceeds to sell them generally to the public, however, the entire system of mandatory public disclosure is evaded to public detriment.

In reviewing the Section 5 claim here, we note that the "Supreme Court has long instructed that securities law places emphasis on economic reality and disregards form for substance." *SEC v. M & A W., Inc.*, 538 F.3d 1043, 1053 (9th Cir. 2008). We are concerned with whether in substance Platforms issued its securities to the public without a registration or exemption.

**[4]** "Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption."

*SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)). Exemptions from registration provisions are construed narrowly "in order to further the purpose of the Act: To provide full and fair disclosure of the character of the securities, and to prevent frauds in the sale thereof." *Id.* (quoting Securities Act of 1933, ch. 38, Tit. 1, 48 Stat. 74 (1933)) (punctuation omitted).

The defendants allege that two registration exemptions are applicable in this case. First, they argue that there is a genuine issue of material fact whether the transfer of ownership from Intermedia to Draper and Benefit Consultants qualified for an exemption under Securities Act Section 4(1), 15 U.S.C. § 77d(1), because, the defendants' argument runs, Intermedia was not an "affiliate" of Platforms as defined in 17 C.F.R. § 230.144(a)(1). Second, they argue that even if Intermedia was an affiliate of Platforms, there is a genuine issue of material fact whether the issuance of shares by Platforms qualified for an exemption under Securities Act Section 4(2), 15 U.S.C. § 77d(2), because they took reasonable care to assure that Intermedia was not an underwriter. *See* 17 C.F.R. § 230.502(d). We address each exemption in turn.

**1**

**[5]** Section 4(1) of the Securities Act exempts from registration "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1). Because Platforms was an "issuer," its issuance of shares cannot qualify for this exemption. *See* 15 U.S.C. § 77b(a)(4) (defining "issuer" as "every person who issues or proposes to issue any security"). It is undisputed, however, that Intermedia, Draper, and Benefit Consultants were not "issuers" or "dealers." *See id.* §§ 77b(a)(4), 77b(a)(12) (defining "dealer" as "any person who engages . . . as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading" in securities). The transfer of ownership of Platforms' stock

from Intermedia to Draper and Benefit Consultants could thereby qualify for this exemption if Intermedia, Draper, and Benefit Consultants were not "underwriters."

**[6]** The definition of "underwriter" in the Securities Act is expansive. Section 2(a)(11), 15 U.S.C. § 77b(a)(11), defines underwriter to mean "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security . . . ." "Underwriter status is not dependent on a formal underwriting agreement or even compensation for serving as an underwriter. Any intermediary between the issuer and the investor that is an essential cog in the distribution process may be a statutory underwriter." Thomas Lee Hazen, Federal Securities Law 44 (2d ed. 2003).

**[7]** Rule 144 establishes several explicit safe harbors that qualify for the Section 4(1) exemption. If a transaction complies with the requirements of Rule 144, the parties involved are deemed not to fall within the statutory definition of underwriters for purposes of the transaction. 17 C.F.R. § 230.144. When the transactions at issue took place, Rule 144(k) permitted a person to resell securities without restriction under certain circumstances if that person was not an "affiliate" of the issuer at the time of the sale or within the three months preceding the sale. 17 C.F.R. § 230.144(k) (2001); *M & A W.*, 538 F.3d at 1046 n.1. "Affiliate" is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1).

**[8]** The defendants allege that the transactions between Intermedia, Draper, and Benefit Consultants qualified for a Rule 144(k) safe harbor.[8] The district court concluded, how-

---

[8]Rule 144(k) is not the only safe harbor contained in Rule 144. *See M & A W.*, 538 F.3d at 1051 n.7. The parties do not contend that the transactions met the requirements of any other Rule 144 provisions, and we are aware of none that might apply.

ever, that there was no genuine issue of material fact that Platforms and Intermedia were under Martin's "common control" at the time of the sale and in the three months preceding it, rendering Intermedia an affiliate of Platforms and destroying eligibility for the Rule 144(k) safe harbor. On appeal, Martin and Platforms do not dispute that Martin, as Platforms' acting CEO, controlled Platforms at relevant times. And so the crux of the appeal turns on whether Martin controlled Intermedia.

Rule 144 does not define "control." However, Rule 405 of Regulation C contains an identical definition of "affiliate" and defines "control." *See SEC v. Kern*, 425 F.3d 143, 149 (2d Cir. 2005) (using Rule 405's definition of "control" to interpret Rule 144). "The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. " 'Control' is not to be determined by artificial tests, but is an issue to be determined from the particular circumstances of the case. Under Rule 405 . . . it is not necessary that one be an officer, director, manager, or even shareholder to be a controlling person. Further, control may exist although not continuously and actively exercised." *Pennaluna & Co. v. SEC*, 410 F.2d 861, 866 (9th Cir. 1969) (citation omitted); *see also United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (stating that control is "a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved").

**[9]** We agree with the district court that there is no genuine issue of material fact that Martin controlled Intermedia at the time of the transactions. These points, as we see the record, are critical: It is undisputed that Martin was an officer of Intermedia at the time of the transfers, and that he then represented himself to be its President and CEO. The SEC also

produced evidence to establish that Martin was not a mere titular officer of Intermedia after the ownership transfer to his former wife in January 2000.[9] For example, in February 2000, Martin applied for a business Visa credit card on behalf of Intermedia and signed the document as Intermedia's "President & CEO." An October 2000 "Certification of Corporate Authorization to Transfer" document "authorize[s] and empower[s]" Martin "to transfer, convert, endorse, sell, assign, set over and deliver any and all . . . securities . . . in the name of or owned by" Intermedia, and was executed by Martin in his capacity as "President" of Intermedia. In November 2000, Martin's personal assistant at Platforms, Kate Marshall, wrote checks to Intermedia from a checking account labeled "Intermedia Video Marketing Corp; Intermedia/Platforms Acct A." Also in November 2000, Martin sold Platforms stock from a brokerage account registered to "Intermedia Video Marketing Corp.; Attn: William C. Martin."

[10] Perhaps most importantly, Martin has never disputed

_____

[9]We reject defendants' claim that the district court erred by considering new evidence of Intermedia's affiliate status submitted with the SEC's reply brief in support of summary judgment. Ordinarily, "where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the nonmovant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (punctuation omitted). However, the defendants previously had explicitly admitted in their answer to the complaint that Martin controlled Intermedia, and the SEC had no reason to know that the issue would be contested until defendants first denied their admission in their memorandum in opposition to summary judgment. Accordingly, it was not unfair to let the SEC address this issue in its reply brief. Moreover, the defendants did not object to the SEC's new evidence and had two months before oral argument on the summary judgment motion to submit rebuttal evidence. At oral argument on the summary judgment motion, the defendants' attorney was specifically asked by the trial judge, "Where is the evidence of [Martin's former wife's] control before the Court," to which defendants' attorney responded, "all we have is the transfer [of ownership]."

that the specific transactions at issue in this case were orchestrated under his direction. For example, in his May 2001 deposition, Martin described the stock that Platforms transferred to Draper and Benefit Consultants as "basically stock that's mine," stating that "[Platforms] owes me a large amount of stock" and that "what I did was authorize [Platforms] to make a loan to Benefit Consultants."

The defendants argue that the transfer of ownership of Intermedia from Martin to his former wife raises a genuine factual issue of control. We disagree. Ownership is one means of control, but it is not the only means, and multiple persons can exercise control simultaneously. Martin's position as a top-ranking officer of Intermedia with the explicit power to direct the specific share transfers at issue establishes control resting on Martin's title and role in the company. That conclusion is not contradicted by the mere fact of an ownership transfer.[10]

The defendants next contend that attorney Brown's opinion letters stating that Intermedia was not an affiliate of Platforms also raise a genuine issue of fact on control. We reject this argument. Brown's letters, offering only legal opinions, and premised on the information provided by defendants, do not bear on the issue of Intermedia's affiliate status.

Finally, the defendants contend that Martin's affidavit, in which he denies controlling Intermedia following the ownership transfer to his former wife, raises a genuine factual issue of control. Martin's affidavit states in part:

> 6.   My former wife informed me that she intended to close the outstanding business of Intermedia, liquidate the company, and discontinue ongoing busi-

---

[10]Consistent with this conclusion, at oral argument on the SEC's summary judgment motion, defendants' counsel stated that Martin's former wife "was not trying to gain control of the company to run it."

ness operations as soon as practicable. Based on her statements, I no longer considered Intermedia to be an operating business, and it did not even occur to me that I might, or should, resign as an officer.

. . .

8.    After I was hired by Platforms, I was no longer involved or participated in any decision making, or exercise any control over Intermedia. It is my belief that, if I had tried to exercise any form of control, my former wife had the legal right to, and would have, prevented me from doing so. She gradually proceeded to liquidate the company.

We agree with the district court that Martin's affidavit does not raise a genuine issue of material fact whether he controlled Intermedia. Control is based on whether a person had "possession . . . of the power to direct or cause the direction of the management and policies" of the company. 17 C.F.R. § 230.405. That Martin's wife planned to liquidate Intermedia, that Martin no longer considered Intermedia to be an operating company, and that it did not occur to him to resign as an officer of Intermedia, are statements of subjective belief irrelevant to the control issue because they do not address Martin's *power* to direct the actions of Intermedia after the ownership transfer to his wife. Martin's affidavit states that he was "no longer involved or participated in any decision making," that he no longer "exercised" any control over Intermedia, and that his wife would have prevented him from exercising control had he attempted to do so, but Martin has given no evidence to support these general, conclusory assertions, nor has he rebutted the normal inference to be taken from his proven abilities to get a company credit card and to direct transfer of stock.[11] The SEC has introduced specific evi-

---

[11]Martin has not, for example, offered to explain or otherwise rebut any of the specific acts evincing his control over Intermedia after transfer of ownership to his wife. Nor has he offered evidence of instances where his former wife blocked his attempts to exercise control.

dence that Martin continued to act in his official capacity as Intermedia's President and CEO after the ownership transfer. By contrast, Martin's conclusory statements do not set out "specific facts" raising a genuine issue over whether Martin was CEO and President of Intermedia in name-only.[12] *See* Fed R. Civ. P. 56(e)(2); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997) (holding that the president of a company cannot raise a genuine issue of material fact that she was president in name only by introducing "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence").

[11] The SEC has adduced evidence showing that Martin controlled Intermedia at the time of the stock transfers. The defendants have not adduced relevant evidence giving rise to a genuine issue for trial on this point. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). We hold that Intermedia was an affiliate of Platforms at the time of the transactions, and the transactions do not qualify for the Rule 144(k) safe harbor.[13]

Our conclusion that the Rule 144 safe harbor does not apply to these transactions is reinforced by the purposes underlying Securities Act registration. Of paramount impor-

---

[12]The defendants argue the district court improperly discredited Martin's affidavit at summary judgment as self-serving. *See SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) ("In most cases . . . that an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." (brackets omitted)). We need not reach this issue because Martin's affidavit, even if credited, does not raise a genuine issue of material fact.

[13]The defendants argue that the district court abused its discretion by denying leave to amend their answer to allege that Intermedia was not Platforms' affiliate. Because we hold that there is no genuine issue of material fact that Intermedia *was* Platforms' affiliate, amendment would have been futile. The district court therefore did not abuse its discretion in denying the defendants leave to amend. *See Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

tance is the protection of investors through public disclosure of information necessary to make informed investment decisions. *See SEC v. Ralston Purina*, 346 U.S. 119, 124 (1953). "Section 4(1) was intended to exempt only trading transactions between individual investors with relation to securities already issued," not to exempt distributions by issuers. *SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941). Strictures placed on transactions involving "affiliates" prevent those possessing superior access to information and the power to compel registration from abusing their privileged position to foist unregistered securities on an unwitting public. *See, e.g.*, *M & A W.*, 538 F.3d at 1053. Martin's relationship with Intermedia put him in the position to issue large quantities of unregistered Platforms' stock through Intermedia. He so did. To allow Intermedia's participation in the transaction to shield Martin and Platforms from their Section 5 registration obligations would do violence to the spirit of the Section 4(1) exemption and reward an unsound theory of compliance with Rule 144. "In view of the objectives and policies underlying the Act, [Rule 144] shall not be available to any individual or entity with respect to any transaction which, although in technical compliance with the provisions of the rule, is part of a plan by such individual or entity to distribute or redistribute securities to the public." Notice of Adoption of Rule 144, 37 Fed. Reg. 591, 595 (Jan. 13, 1972). The need to protect the public from unregistered securities sales by issuers and those acting in concert with them counsels us to deny the defendants the protection of Rule 144.

Ordinarily, failure to qualify for the Rule 144 safe harbor does not automatically prevent a transaction from qualifying for the broader Section 4(1) exemption. In this case however, Intermedia's affiliate status precludes any eligibility for the exemption. *See SEC v. Cavanagh*, 445 F.3d 105, 111 n.12 (2d Cir. 2006) (observing that affiliates of an issuer are ordinarily "outside the coverage of Section 4(1)"). Because Intermedia was an "affiliate" of Platforms at the time the transactions took place, by definition it necessarily also qualified as an "is-

suer" for the limited purpose of defining underwriters under Section 2(a)(11). *See* 15 U.S.C. § 77b(a)(11) ("As used in this paragraph the term 'issuer' shall include . . . any person under direct or indirect common control with the issuer."). Having acquired the securities from an "issuer" with an aim to distribute those securities to the public, Draper and Benefit Consultants are rendered underwriters, making the transaction ineligible for the Section 4(1) exemption.

**2**

**[12]** Section 4(2) of the Securities Act, 15 U.S.C. § 77d(2), exempts from registration "transactions by an issuer not involving any public offering." "[T]he applicability of [Section 4(2)] should turn on whether the particular class of persons affected need the protection of the [Securities] Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.' " *Ralston Purina*, 346 U.S. at 125. Stated another way, a limited distribution to highly sophisticated investors, rather than a general distribution to the public, is not a public offering.

**[13]** SEC-promulgated Regulation D creates a safe harbor within this exemption by defining certain transactions as non-public offerings. *McGonigle v. Combs*, 968 F.2d 810, 825 n.19 (9th Cir. 1992); Revision of Certain Exemptions, Securities Act Release No. 6389, 24 S.E.C. Docket 1166 (March 8, 1982). To qualify for Regulation D safe harbors, the issuer must comply with Rule 502(d) and "exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(11) of the Act." 17 C.F.R. § 230.502(d). Rule 502(d) defines "reasonable care" in this way:

> (1) Reasonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons;

(2) Written disclosure to each purchaser prior to sale that the securities have not been registered under the Act and, therefore, cannot be resold unless they are registered under the Act or unless an exemption from registration is available; and

(3) Placement of a legend on the certificate or other document that evidences the securities stating that the securities have not been registered under the Act and setting forth or referring to the restrictions on transferability and sale of the securities.

While taking these actions will establish the requisite reasonable care, it is not the exclusive method to demonstrate such care.

*Id.* The parties agree that the transactions here do not qualify for the Section 4(2) exemption unless Platforms and Martin complied with Rule 502(d) and took reasonable care to assure that Platforms was not issuing securities to an underwriter. Martin and Platforms concede that they took none of the three actions explicitly enumerated in Rule 502(d). They argue that there is, nonetheless, a genuine issue of material fact whether they took reasonable care under Rule 502(d) because (1) a fact-finder could conclude that the defendants reasonably relied on Brown's opinion letter stating that Intermedia was not an affiliate of Platforms, and because (2) Intermedia was not, in fact, an underwriter.

We agree with the district court that there is no genuine issue of material fact that the defendants did not exercise reasonable care as defined in Rule 502(d). First, even assuming that "reasonable care" in Rule 502(d) might encompass reliance on a good faith legal opinion, Brown's letters do not opine that Intermedia was not an affiliate of Platforms. Both letters state that Brown had "relied on" the assumption that Intermedia was not an affiliate of Platforms, a fact "which [Platforms] has furnished to me and represented to be true and

correct." Certainly, the defendants were not entitled to rely on a conclusion of law that they themselves provided, and the defendants have adduced no other evidence of any affirmative steps taken to assure that Intermedia was not an underwriter.

**[14]** Second, whether or not Intermedia was in fact a statutory underwriter does not bear on whether defendants exercised reasonable care under Rule 502(d). Registration exemptions are to be narrowly construed in favor of disclosure. *Murphy*, 626 F.2d at 641. By its plain terms, Rule 502(d) required Platforms and Martin to "exercise" reasonable care to "assure" that Intermedia was not an underwriter, having thereby "demonstrated" reasonable care through their "actions." 17 C.F.R. § 230.502(d). Rule 502(d)'s ostensible purpose is to influence the actions of issuers; its protection becomes necessary only if the transferee of the securities does in fact act as an underwriter and distribute the securities to the public. *See, e.g.*, Interpretative Releases, Securities Act Release No. 33-5121, 1970 WL 116591 (December 30, 1970) ("It is essential that the issuer of the securities take careful precautions to assure that a public offering does not result through resales of securities purchased in transactions [exempt under Section 4(2)], for, if in fact the purchasers do acquire the securities with a view to distribution, the seller assumes the risk of possible violation of the registration requirements of the Act . . . ."). Persons with access to material nonpublic information about Platforms sold 17.45 million unregistered securities to those without access to such information, and the defendants took no steps to prevent those transactions from occurring. On those facts, the defendants cannot establish that they exercised reasonable care to assure that Intermedia was not an underwriter.

**[15]** The transactions were not registered under Section 5 and no exemption applies. We affirm the summary judgment on the Section 5 claim.

**B**

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to employ "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under Section 10(b), makes it unlawful, in connection with the purchase or sale of a security, to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

**[16]** A violation of Section 10(b) and Rule 10b-5 is established if the defendant (1) made a material misrepresentation or omission (2) in connection with the purchase of a sale or security (3) with scienter (4) in interstate commerce. *Phan*, 500 F.3d at 907-08. An omitted fact is material "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* at 908 (quotation marks omitted)). Scienter can be established by intent, knowledge, or in some cases "recklessness." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc).

On appeal, the defendants challenge the summary judgment on the SEC's Section 10(b) and Rule 10b-5 claim based on the August 2000 press release. They contend that there are genuine issues of material fact whether the press release was materially misleading and whether it was issued with reckless scienter.

**1**

The parties dispute what degree of subjective recklessness is necessary to establish scienter under Section 10(b) and Rule

10b-5. Both agree that some degree of subjective understanding of the risk of misleading others is required. The SEC argues that the defendants need only have been aware that the misleading statement was made and have knowledge of the facts that made it "objectively obvious" that the statement was misleading. The defendants argue that liability further requires that the defendant have been subjectively aware of the risk that the statement could be misleading, i.e. that the defendant must have acted "deliberately."

In *Hollinger*, 914 F.2d 1564, we adopted "the standard of recklessness articulated by the Seventh Circuit in *Sundstrand Corp. v. Sun Chem. Corp.*" *Id.* at 1569. That definition states:

> Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. . . . [T]he danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing, and the omission must derive from something more egregious than even 'white heart/empty head' good faith.

*Hollinger*, 914 F.2d at 1569 (citations omitted).

In *Sundstrand*, the Seventh Circuit subdivided its recklessness definition into two parts: (1) an objective test, analyzed according to whether the misrepresentation was "known or so obvious that any reasonable man would be legally bound as knowing," and (2) a subjective test, requiring more than "white heart/empty head" good faith. 553 F.2d 1033, 1045 & nn.19-20 (7th Cir. 1977). The Seventh Circuit elaborated on the subjective test as follows:

> This is a subjective test with the requirement of something more than 'inexcusable negligence' . . . . Thus if a trial judge found, for example, that a defendant genuinely forgot to disclose information or that it never came to his mind, etc., this prong of the [recklessness test] would defeat a finding of recklessness even though the proverbial 'reasonable man' would never have forgotten.

*Id.* at 1045 n.20.

We revisited *Hollinger* in *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999), while addressing the standard for pleading under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Silicon Graphics* concluded that *Hollinger* had adopted a "deliberate recklessness" standard:

> Our definition of recklessness, as taken from *Sundstrand*, strongly suggests that we continued to view it as a form of intentional or knowing misconduct. We used the words "known" and "must have been aware," which suggest consciousness or deliberateness. Indeed, we expressly acknowledged our own prior statement that "recklessness is a form of intent rather than a greater degree of negligence."

*Id.* at 976-77 (citing *Hollinger*, 914 F.2d at 1569). We have since observed, however, that "[b]ecause the PSLRA did not alter the substantive requirements for scienter under § 10(b), . . . the standard on summary judgment or JMOL remains unaltered by [*Silicon Graphics*]." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).

In *Gebhart v. SEC*, 595 F.3d 1034 (9th Cir. 2010), our most recent case to address the issue of reckless scienter, we concluded that scienter requires "either knowledge of falsity or conscious recklessness." *Id.* at 1041 n.10. "Scienter . . . is a

subjective inquiry. It turns on the defendant's actual state of mind." *Id.* at 1042. Thus, "although we may consider the objective unreasonableness of the defendant's conduct to raise an inference of scienter, the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Id.*

**[17]** These precedents lead us inescapably to two conclusions. First, *Gebhart*, interpreting *Silicon Graphics* and *Hollinger*, makes it clear that scienter requires either "deliberate recklessness" or "conscious recklessness," and that it includes "a subjective inquiry" turning on "the defendant's actual state of mind." 595 F.3d at 1041-42. Evidence showing that the defendants did not appreciate the gravity of the risk of misleading others is relevant to such a determination. *See id.* at 1042 n.11 (holding that "the factfinder must consider the direct and circumstantial evidence as a whole" to determine whether the defendant "consciously disregarded the risk" that the statements were false).

**[18]** Second, despite our first conclusion, a defendant ordinarily will not be able to defeat summary judgment by the mere denial of subjective knowledge of the risk that a statement could be misleading. Summary judgment requires a statement that is materially misleading such that no reasonable jury could conclude otherwise. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Moreover, the statement must present a danger of misleading buyers or sellers "that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger*, 914 F.2d at 1569. When the defendant is aware of the facts that made the statement misleading, "he cannot ignore the facts and plead ignorance of the risk." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008); *see also Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) ("Summary judgment is generally inappropriate when mental state is an issue, *unless no reasonable inference supports the adverse party's claim.*" (emphasis added)).

Stated another way, if no reasonable person could deny that the statement was materially misleading, a defendant with knowledge of the relevant facts cannot manufacture a genuine issue of material fact merely by denying (or intentionally disregarding) what any reasonable person would have known.

**2**

With this scienter standard in mind, we turn to the merits of the summary judgment on the Section 10(b) and Rule 10b-5 claim based on the August 2000 press release.[14]

First, the district court concluded that the press release was materially misleading because it "only permits the conclusion that Platforms was announcing it had actually developed a viable ARC system." It is undisputed that at the time of the press release, Platforms had only a design of the system, had no operational prototype, and did not have the money to build a prototype. On appeal, the defendants argue that a genuine issue of material fact exists because the press release could be interpreted in a manner consistent with the nascent state of the ARC System and of Platforms' finances.

**[19]** We reject the defendants' argument. No reasonable person could read the press release and infer anything other than that a functioning ARC System existed. The press release is titled "Platforms *Unveils* New Airborne Wireless Communications 'Zer0Gravity AeroStructures.'" It speaks in the present tense, stating, for example, that "the Zer0Gravity AeroStructure *is* a large, manned, helium-filled,

---

[14]In their motion for reconsideration, the defendants submitted twenty-eight new evidentiary exhibits and a new declaration by Martin. The district court declined to consider this evidence because it was not before it during the original summary judgment proceeding. On appeal, the defendants argue that Ninth Circuit Rule of Appellate Procedure 30-1.4(a)(xi) permits us to consider this new evidence. We disagree. Rule 30-1.4(a)(xi) establishes criteria for the inclusion of record evidence in the excerpts of record. It does not authorize us to consider extra-record evidence.

aerodynamically-shaped airship structure," and that "[t]he Aerodynamic shape and skin of the AeroStructure *are* resistant to inclement weather conditions." It makes performance assertions about the ARC System, stating that it resists winds "of up to 90 MPH," and that "[t]his important new development has enabled Platforms to: (i) improve System operational efficiency and cost-effectiveness, reducing *ARC System fixed-wing operating costs by 40 percent*." The release is nine pages long in small font and discusses, in detail, five specific models of AeroStructure, describing their particular performance characteristics, including their service coverage areas and maximum service capacities. Considered as a whole, the press release leaves the unmistakable impression that the ARC System exists. By contrast to the true facts, this press release was deceptive, an absolute and unequivocal falsehood.

The defendants' alternative interpretation of the press release is not plausible. The statements relied on by defendants, read in context, do not dampen the clear impression that a functioning ARC System exists and has been tested. The defendants analogize the press release's description of the ARC System to Boeing's practice of issuing press releases about a new model of airliner. However, the defendants are not Boeing and the ARC System is not an airplane. Unlike Boeing, defendants had not successfully launched prior aircraft models. Unlike Boeing, defendants did not have ample capital available to further their ends. Whatever Boeing's practices may be, the comparison between Platforms' ARC System and a well-known company producing a new model with proven technology is inapt and irrelevant. Nor do Platforms' subsequent press releases correct, or even attempt to correct, the misleading statements and material omissions in the August 2000 press release.

**[20]** Second, the district court concluded that because Martin knew Platforms did not have an operating prototype, there was no genuine issue of material fact that Martin acted with deliberate recklessness by issuing the August 2000 press

release. We agree. Martin admitted in his deposition that when the press release was given, Platforms did not have the ARC System but rather only "the description and definition of how the system would operate"; that Platforms had never produced a "commercial version" of the antenna payload; that Platforms had not purchased an aerostat; and that it had never manufactured the completed product. A finished, tested product is almost certainly the single most important piece of information for an investor deciding whether to invest in a start-up company. The defendants cannot plausibly argue that omitting the fact that the ARC System *did not exist* was not a "highly unreasonable omission." *See Hollinger*, 914 F.2d at 1569. Martin argues that he nonetheless subjectively believed that the press release was not misleading, but for the reasons stated above, we have concluded that no reasonable juror could credit that assertion. If such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud. Similarly, the defendants argue that "companies in related industries typically tailor products for customers over the course of months" and that Platforms personnel "considered acquisition of an aerostat to be reasonably simple." But even if Martin had these things in mind, it doesn't negate that Martin knew that Platforms had not produced a complete, field-tested ARC System, and that he authorized the materially misleading press release suggesting that Platforms had in fact done so. Because no reasonable juror could conclude that Martin was not conscious of the risk that the press release would be misinterpreted, we conclude that Martin was deliberately reckless in issuing this press release.

**[21]** We hold that there is no genuine issue of material fact that the August 2000 press release was materially misleading and issued with deliberate recklessness. The summary judgment as to the August 2000 press release is affirmed.

## IV

Platforms and Martin next challenge the district court's order holding them jointly and severally liable for disgorge-

ment of about $1.75 million in proceeds from the sales of unregistered Platforms securities in violation of Section 5. We review orders of disgorgement for an abuse of discretion. *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006).

## A

**[22]** "[A] district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) (quotation marks and citations omitted). "[T]he amount of disgorgement should include all gains flowing from the illegal activities." *JT Wallenbrock*, 440 F.3d at 1114 (quotation marks omitted). Disgorgement need be "only a reasonable approximation of profits causally connected to the violation." *First Pac. Bancorp*, 142 F.3d at 1192 n.6.

The SEC "bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989); *see also First Pac. Bancorp*, 142 F.3d at 1192 n.6. Once the SEC establishes a reasonable approximation of defendants' actual profits, however, we join our sister circuits and hold that the burden shifts to the defendants to "demonstrate that the disgorgement figure was not a reasonable approximation." *First City Fin.*, 890 F.2d at 1232; *see also SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004); *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996) (per curiam). We place this burden on the defendants because information is not "obtainable at negligible cost." *First City Fin.*, 890 F.2d at 1231. The defendants are more likely than the SEC to have access to evidence establishing what they paid for the securities, if anything, to whom the proceeds from the sales were distributed, and for what purposes the proceeds were used.

And although "[p]lacing the burden on the defendants of rebutting the SEC's showing of actual profits . . . may result . . . in actual profits becoming the typical disgorgement measure," we conclude that "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* at 1232.

The district court did not abuse its discretion in adopting the SEC's disgorgement figure. The SEC calculated the amount of proceeds obtained from the illegal sale of 17.45 million unregistered securities: $1,756,861. The calculations were a precise sum of all of the proceeds from the sales, and the SEC provided spreadsheets illustrating the sales, dates, and totals. The defendants do not dispute that these were the total proceeds. We conclude that this was a reasonable approximation of the profits obtained from the unlawful sales.

**[23]** The defendants attempt to distinguish "profits" from "proceeds" and contend that the SEC should have attempted a "more reasonable approximation of profits." But they do not explain what, if anything, was not "profit" in the $1.75 million in proceeds received from the sales of unregistered securities. There is no evidence in the record, and the defendants do not contend, that they paid cash value for the newly-issued shares. To the extent that any cash value was paid, the defendants could have easily produced that evidence to rebut the SEC's proposed disgorgement amount. Assuming that the securities were paid as compensation for services rendered, we do not see evidence of substantial value: Platforms was a low-priced penny-stock, the securities were unregistered and could not be sold to the public *at all*, and Platforms did not have any source of income or assets, rendering any such value speculative and small. Nor, and importantly, did the defendants produce any evidence of such a valuation of stock given in compensation for services. Accordingly, and given this failure of proof from defendants, it was not an abuse of discretion for the district court to conclude that the entire proceeds from

the sale were a "reasonable approximation" of the profits from the transactions.

Similarly, the defendants's reliance on the Seventh Circuit's decision in *SEC v. McNamee*, 481 F.3d 451 (7th Cir. 2007), is misplaced. In *McNamee*, the Seventh Circuit vacated a contempt-of-court fine comprising the total proceeds earned from unlawful sales of unregistered securities in violation of a temporary restraining order. The Seventh Circuit concluded that because a contempt-of-court fine "compensates the complainant for losses sustained," full repayment of the proceeds would exceed the damage caused since the securities still retained some value. *Id.* at 456-58 (brackets omitted). Unlike the damages at issue in *McNamee*, however, the purpose of a disgorgement remedy is to prevent unjust enrichment and to make securities law violations unprofitable, not to compensate victims. Allowing the defendants to retain *any* money from the unlawful transactions would allow them to unjustly profit from exchanging unregistered securities for cash at public market prices.

Martin and Platforms next argue that the disgorgement amount should have been limited to the amount of proceeds that they personally received from the unlawful sales. They rely on *Hateley v. SEC*, 8 F.3d 653 (9th Cir. 1993). In *Hateley*, a broker dealer and two officers of a securities firm were ordered to disgorge 100% of the profits obtained based on an illegal agreement, even though the agreement itself appropriated to them only 10% of the profits as a commission. *Id.* at 655-56. We held that it was error to order disgorged more than the amount the individuals ultimately received, because "the very agreement that [was] the source of their liability" also limited their ill-gotten gains, and we "must view the agreement as a whole and cannot single out the aspects of it that are favorable to the SEC's position and disregard the parts that are not." *Id.*

In contrast, in *JT Wallenbrock & Associates*, 440 F.3d 1109, we distinguished *Hateley* and rejected an argument sim-

ilar to the one now made by the defendants. In *JT Wallen-brock*, the defendants had raised more than $250 million through the fraudulent sale of unregistered promissory notes. *See* 440 F.3d at 1111-12. The district court held each of the defendants jointly and severally liable and ordered disgorgement of a substantial portion of that amount. *Id.* at 1113. On appeal, the defendants argued that *Hateley* required the district court to exclude from the amount of disgorgement amounts that they had reinvested and had not kept for themselves. *Id.* at 1116. We disagreed, distinguishing *Hateley* on the grounds that "there was no preexisting agreement limiting the defendants to only a share of the ill-gotten gain or requiring them to pay a portion of the proceeds to third parties." *Id.* "The manner in which [the defendant] chose to spend the illegally obtained funds has no relevance to the disgorgement calculation . . . ." *Id.*

**[24]** The district court did not abuse its discretion by holding Martin and Platforms liable for all proceeds from the unlawful sales. A person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained. *See id.* The defendants argue that the SEC "cited no evidence that Martin, Platforms, or Intermedia ever controlled the sales proceeds." But it is undisputed that the 17.45 million Platforms shares sold were beneficially owned by Intermedia, and we have determined that Martin controlled Intermedia. Unlike the defendants in *Hateley*, Martin had control over when and by whom the securities would be sold and hence how the proceeds would be used.

**B**

**[25]** The district court held Martin and Platforms jointly and severally liable for the full disgorgement amount. "[W]here two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally lia-

ble for the disgorgement of illegally obtained proceeds." *First Pac. Bancorp*, 142 F.3d at 1191. Martin does not dispute that he and Platforms had a "close relationship" and collaborated in the Section 5 violations. He argues, however, that the district court erred because he did not "personally benefit" from the violations by receiving money or other remuneration.

**[26]** We hold that the district court did not abuse its discretion in holding Martin jointly and severally liable with Platforms. We have never held that a personal financial benefit is a prerequisite for joint and several liability.[15] Rather, we have held defendants jointly and severally liable in cases where, for example, the defendants "used all of the investors' funds to operate their . . . scheme and invest in speculative business ventures, all to the defendants' benefit." *JT Wallenbrock*, 440 F.3d at 1117; *see also id.* at 1114 (holding the defendants liable for disgorging money they did not personally receive because "[r]ather than put their own money at risk, the defendants benefitted from the use of investors' money to spend at the defendants' discretion"). It is undisputed that the proceeds from the securities sales were used to pay Platforms' operating expenses and compensation to Platforms employees, and that at the time the securities were sold to the public, Martin had sunk over $2 million of his own money into Platforms. Martin therefore benefitted from the Section 5 violations by keeping Platforms afloat, defraying further investment of his own money, and protecting his substantial personal financial interest in the company. Even if some personal financial benefit to Martin were required, Martin's financial stake in Platforms' survival qualifies.

**[27]** Moreover, 15 U.S.C. § 77o by its express terms holds all controlling persons jointly and severally liable for viola-

---

[15]Martin relies on *First Pacific Bancorp*, but that decision *rejects* a defendant's argument that he received no personal financial benefit from the transaction without ever addressing whether a personal financial benefit is required. *See* 142 F.3d at 1192.

tions of Section 5, without regard to their degree of personal benefit. Martin orchestrated the unlawful transactions and had control of the proceeds via his control of Platforms and Intermedia. It is not inequitable to require Martin jointly to share the burden of restoring the illegally obtained monies, even if he did not allocate them to himself. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (holding that where a firm's owner and chief executive officer collaborated in unlawful conduct leading to securities law violations, "it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order"); *see also First Pac. Bancorp*, 142 F.3d at 1191-92. The district court did not abuse its discretion by imposing joint and several liability on Martin and Platforms.

## V

The defendants next challenge the district court's award of $974,586 in prejudgment interest. We review prejudgment interest awards for an abuse of discretion. *Simeonoff v. Hiner*, 249 F.3d 883, 894 (9th Cir. 2001).

The defendants contest the district court's decision to calculate interest based on the rate provided in 26 U.S.C. § 6621 for tax underpayment, rather than the treasury-bill rate provided in 28 U.S.C. § 1961 for post-judgment interest on money judgments in civil cases. Ordinarily, 28 U.S.C. § 1961 "is to be used for the calculation of prejudgment interest unless the equities of a particular case demand a different rate."[16] *In re Nucorp Energy, Inc.*, 902 F.2d 729, 734 (9th Cir. 1990) (quotation marks omitted).

---

[16]Courts in our circuit have, on occasion, calculated prejudgment interest in SEC enforcement actions using the Section 1961 rate. *See, e.g.*, *SEC v. M & A W.*, No. C-01-3376 VRW, 2005 WL 2988963, at *2 (N.D. Cal. Oct. 31, 2005), *rev'd*, *SEC v. M & A W., Inc.*, 538 F.3d 1043 (9th Cir. 2008).

**[28]** The district court did not abuse its discretion by calculating prejudgment interest based on the tax-underpayment rate. The SEC has adopted the tax underpayment rate for prejudgment interest on orders of disgorgement in all administrative proceedings. *See* SEC Rules and Regulations, 60 Fed. Reg. 32,738, 32,788 (June 23, 1995) (codified at 17 C.F.R. § 201.600(b)). We conclude that the SEC's reasoning on this issue is persuasive. The defendants unlawfully received money from investors by distributing unregistered securities to the public in violation of Section 5. This was the rough equivalent of receiving "an interest free loan" from investors. *See id.* The proper measurement of the benefit of the "loan" is the interest rate the defendants would have otherwise paid to finance their business operations with a comparable, unsecured loan. *Id.* The interest rate reflected in Section 6621, "a widely published, floating rate based on a fixed margin above the rate for treasury bills," is a reasonable proxy for the interest rate that would ordinarily be charged on an unsecured loan. *Id.*

The defendants also argue that the SEC has not shown equitable reasons for departing from the 28 U.S.C. § 1961 rate. We conclude, however, that Section 1961 provides an inappropriate interest rate in this case. The treasury-bill rate in Section 1961 reflects the interest rate paid for *lending* money to the U.S. Government, not for *borrowing* money. *First Jersey Sec.*, 101 F.3d at 1476-77. It is therefore "not an appropriate measure of prejudgment interest to charge in remedial proceedings, where the purpose of the prejudgment interest is to deny a wrongdoer any economic benefit from his violations." SEC Rules and Regulations, 60 Fed. Reg. at 32,788. By imposing a lower interest rate than the one reflected in Section 6621, the defendants would benefit from their unlawful conduct by obtaining their $1.75 million "loan" from investors at a below-market rate.

**[29]** The defendants still further argue that the district court improperly calculated prejudgment interest from the

date of the sales of securities to the public, rather than from the date the SEC filed its complaint. We hold that the district court did not abuse its discretion by imposing prejudgment interest from the date the securities were sold in violation of Section 5. "Even if defendants were correct that the present litigation was protracted through some fault of the SEC, defendants plainly had the use of their unlawful profits for the entire period . . . . Given the remedial purpose of the statute, the goal of depriving culpable defendants of their unlawful gains, and the lack of any unfairness to defendants, we see no abuse of discretion in the court's order." *First Jersey Sec.*, 101 F.3d at 1477.

## VI

Platforms contends that the district court improperly denied its motion for reconsideration under Federal Rules of Civil Procedure 59(e) and 60(b). We review the denial of a motion for reconsideration for an abuse of discretion. *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 780 (9th Cir. 2009). Reconsideration under Rule 59(e) is appropriate "if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *Id.* (quotation marks omitted). Rule 60(b) allows a district judge to provide relief from a final judgment on the grounds of, inter alia, "mistake, inadvertence, surprise, or excusable neglect," "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)," or "any other reason that justifies relief." *Id.*

Platforms first urges that the district court abused its discretion by stating that "scienter is not an element of a § 5 violation" when in fact scienter can be considered when granting or denying injunctive relief. We reject this argument. Plat-

forms admits in the same paragraph in its brief that the district court included a scienter finding in its original ruling.

Platforms next argues that the district court abused its discretion by denying defendants an opportunity to respond to the new evidence of Intermedia's affiliate status submitted in the SEC's reply brief during the Section 5 summary judgment proceeding. However, as earlier explained, the district court did not err by considering the SEC's new evidence, and the defendants had an adequate opportunity to respond but did not do so. Nor have the defendants pointed to any "newly discovered evidence" that was previously unknown to them or unavailable during the original summary judgment proceeding. *See Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985).

Platforms also contends that the district court abused its discretion in denying its Rule 60(b) motion based on former counsel Rebecca Wilson's "excusable neglect"—namely her failure to submit evidence on the issue of Intermedia's affiliate status or move to amend their answer to correct the admission prior to the SEC's summary judgment motion. "The determination of whether neglect is excusable is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Lemoge v. United States*, 587 F.3d 1188, 1192 (9th Cir. 2009) (quotation marks omitted). At least four factors are considered: "(1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Id.* In some circumstances, the prejudice a denial would cause to the movant must also be considered, but it is not a factor that must be assessed "in each and every case." *Id.* at 1195.

The district court did not abuse its discretion in rejecting the claim of excusable neglect. The district court concluded that prejudice to the parties was in equipoise, but questioned the defendants' good faith because the evidence of Inter-

media's affiliate status was available to the defendants, and because the defendants' own admission was the cause of the SEC's failure to raise the issue sooner. It also concluded that the proffered reason for the delay—a change in counsel and new counsel's reliance on the SEC's framing of the issues— was not a reasonable excuse. These conclusions are not "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *See United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc). Wilson had four months before the SEC's summary judgment motion to submit evidence or retract the admission and did not do so. Wilson was not entitled to rely on the SEC's "framing" of Intermedia's affiliate status given that it was the defendants' own admission that led to such "framing." "[C]lients must be held accountable for the acts and omissions of their attorneys," and Platforms "cannot now avoid the consequences of the acts or omissions" of its counsel. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 396-97 (1993).

**[30]** We hold that the district court did not abuse its discretion by denying the motion for reconsideration.

## VII

We affirm the summary judgment on the SEC's Section 5 claim and on the Section 10(b) and Rule 10b-5 claim based on the August 2000 press release, the order of disgorgement and prejudgment interest, and the denial of the motion for reconsideration. Because the SEC has elected to abandon its challenge to the denial of summary judgment on its other Section 10(b) and Rule 10b-5 claims, we dismiss the SEC's cross appeal as moot.

**JUDGMENT AFFIRMED. CROSS-APPEAL DISMISSED.**

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2010 Thomson Reuters/West.